948 P.2d 1055

**KAWAMATA FARMS, INC.,**
**Plaintiff–Appellee,**

v.

**UNITED AGRI PRODUCTS, Loveland Industries, Inc., dba United Agri Products (Hawaii); Reginald Hasegawa, E.I. DuPont de Nemours & Company, a Delaware corporation; Terra International, Inc., a Delaware corporation; Platte Chemical Co., a Nebraska corporation; Bartlo Packaging, a New Jersey corporation, Defendants–Appellants.**

**Stanley T. TOMONO and Cynthia T. Tomono dba S.T.T. Farms, Plaintiffs–Appellees–Counter–Defendants–Counter–Appellees,**

v.

**E.I. DuPONT DE NEMOURS & COMPANY, a Delaware corporation; Terra International, Inc., a Delaware corporation; Platte Chemical Co., a Nebraska corporation; Bartlo Packaging, Incorporated, a New Jersey corporation; Loveland Industries, Inc., dba in Hawai'i as Loveland Industries, Inc., United Agri Products Hawaii, Reginald Hasegawa, Defendants–Appellants–Cross–Defendants–Cross–Appellees,**

and

**Kristofer Knutsen; Inger–Lise Knutsen; Bernard H.F. Chun; Marion Bush, Trustee of the Marion Pualani Keliikipi Bush Trust, Defendants–Appellants–Cross–Claimants–Cross–Appellants–Counter–Claimants–Counter–Appellants.**

No. 19201.

Supreme Court of Hawai'i.

Dec. 11, 1997.

---

216

Edward W. Warren, Christopher Landau, Washington, DC, and James Gash, Los Angeles, CA, of Kirkland & Ellis, for appellants E.I. DuPont de Nemours and Company, Inc. and Bartlo Packaging Incorporated.

John R. Lacy, Lisa W. Munger and Bruce L. Lamon of Goodsill Anderson Quinn & Stifel, Honolulu, for appellants E.I. DuPont de Nemours and Company, Inc. and Bartlo Packaging Incorporated.

John S. Nishimoto and Calvin Young of Ayabe, Chong, Nishimoto, Sia & Nakamura, Honolulu, for appellants United Agri Products, Loveland Industries, Inc., United Agri Products (Hawaii), Reginald Hasegawa, and Platte Chemical Co.

William A. Bordner and David Gruebner of Burke Sakai McPheeters & Bordner, Honolulu, for appellant Terra International, Inc.

Stanley H. Roehrig, Andrew P. Wilson, Stephen T. Cox and Kris A. LaGuire of Roehrig, Roehrig, Wilson & Hara, Hilo, and Peter Van Name Esser, Honolulu, for appellees Kawamata Farms, Inc., Stanley T. Tomono and Cynthia T. Tomono dba S.T.T. Farms.

Stephen D. Whittaker and David W. Lacy of The Law Offices of Stephen D. Whittaker, Kailua Kona, for cross-appellants Kristofer

Knutsen, Inger–Lise Knutsen, Bernard H.F. Chun, and Marion Bush, Trustee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

NAKAYAMA, Justice.

In this products liability lawsuit, defendants-appellants-cross-defendants-cross-appellees E.I. DuPont de Nemours and Company, Terra International, Inc., Platte Chemical Co., Bartlo Packaging, Inc., United Agri Products, Loveland Industries, Inc., United Agri Products (Hawaii), and Reginald Hasegawa appeal from a judgment awarding plaintiffs-appellees Kawamata Farms, Inc. and plaintiffs-appellees-counter-defendants-counter-appellees Stanley T. Tomono, and Cynthia T. Tomono a total of more than $23 million in damages for crop damage resulting from a manufacturing defect in Benlate 50 DF and Benlate 50 WP, which are agricultural fungicides. Defendants-appellants-cross-claimants-cross-appellants-counter-claimants-counter-appellants Kristofer and Inger–Lise Knutsen, Bernard H.F. Chun, and Marion Bush also appeal from unfavorable jury verdicts in a declaratory action against them, as well as their counterclaims and cross-claims. For the reasons stated below, we affirm the judgment and all of the circuit court's orders.

## I. BACKGROUND

### A. The Parties

This appeal results from two separate products liability lawsuits that were consolidated for trial. Kawamata Farms, Inc. (Kawamata Farms) is a Hawai'i corporation that produces, distributes, markets, and sells ornamental flowers, including roses, in Hawai'i County. Stanley T. Tomono and Cynthia T. Tomono (the Tomono Plaintiffs) own and operate S.T.T. Farms, a business that grows, markets, and distributes tomatoes, cucumbers, orchids, and various other agricultural products in Hawai'i County.

Kawamata Farms and the Tomono Plaintiffs (referred to collectively as the Plaintiffs) filed their actions in 1991 and 1992, respectively, alleging that their plants, soil, and farm structures had been damaged by Benlate 50 DF and Benlate 50 WP (referred to collectively as Benlate), which are agricultural fungicides that were manufactured by E.I.

DuPont de Nemours and Company (DuPont). The Plaintiffs sued DuPont, Terra International, Inc., Platte Chemical Co., Bartlo Packaging, Inc., United Agri Products, Loveland Industries, Inc., United Agri Products (Hawaii), and Reginald Hasegawa (referred to collectively as the Liability Defendants), who were involved in formulating, manufacturing, packaging, marketing, distributing, and/or selling of Benlate. The Plaintiffs sought compensatory damages under, among other things, theories of negligence and strict products liability, and breach of express warranty. The Plaintiffs also sought punitive damages.

Because the Tomono Plaintiffs had leased some of their farm land from various landlords, the Tomono Plaintiffs sought declaratory relief from the landlords to absolve themselves of responsibility for any alleged damage to the land. Two of the Tomono Plaintiffs' landlords, the State of Hawai'i and the Trustees under the Will and of the Estate of Bernice Pauahi Bishop (Bishop Estate), successfully sought dismissal from the case. The remaining landlords, Kristofer and Inger–Lise Knutsen, Bernard H.F. Chun, and Marion Bush (hereinafter referred to collectively as the Declaratory Defendants), filed a counterclaim against the Tomono Plaintiffs, alleging breach of contract, negligence, and waste. The Declaratory Defendants also filed a cross-claim against the Liability Defendants, essentially adopting the Plaintiffs' causes of action against the Liability Defendants, and seeking compensatory damages for soil remediation, as well as punitive damages.

The Plaintiffs' two lawsuits were consolidated on November 16, 1993, and trial was set for June 14, 1994. As explained below, at the conclusion of the trial, the jury issued a verdict in favor of the Plaintiffs and against the Liability Defendants, finding liability under Counts I and II, in which the Plaintiffs had alleged negligence liability and strict liability, respectively, for the defective manufacture or design of Benlate. The jury also found liability under Count III for the Liability Defendants' breach of an express warranty on the label of Benlate.

With respect to the Tomono Plaintiffs' declaratory action and the Declaratory Defendants' counterclaim and cross-claims, the jury rendered a verdict in favor of the Plaintiffs and Liability Defendants, and against the Declaratory Defendants.

### B. The Recall of Benlate 50 DF

The Liability Defendants formulated, manufactured, packaged, marketed, distributed, and/or sold Benlate 50 DF, a fungicide that the Plaintiffs applied to their plants and soil. On September 1, 1989, the federal Environmental Protection Agency (EPA) issued a stop sale order that, at least temporarily, prohibited DuPont from selling certain lots of Benlate 50 DF because they were contaminated with the herbicide atrazine. Benlate 50 DF was deemed adulterated, and its sale constituted an unlawful act under the Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C.A. §§ 136–136y (1992) (FIFRA). In March 1991, the EPA issued a second stop sale order prohibiting DuPont from selling atrazine-contaminated Benlate 50 DF. Benlate 50 DF was again deemed adulterated, and its sale, again, constituted an unlawful act under the FIFRA. On March 22, 1991, DuPont instituted a total recall of Benlate 50 DF, after which DuPont no longer sold Benlate 50 DF in the United States.

### C. Pre–Trial Motions

Before trial, DuPont and the other Liability Defendants moved for partial summary judgment, asserting that the FIFRA preempted several of the Plaintiffs' claims. In particular, the Liability Defendants contended (1) that the FIFRA's federal regulatory scheme governing the warnings set forth on pesticide labeling and packaging prohibited state law from imposing additional warning requirements on labels and, thus, (2) that the FIFRA preempted the Plaintiffs' claims. The circuit court partially granted the Liability Defendants' motion for partial summary judgment regarding FIFRA preemption issues, dismissing the Plaintiffs' negligence and strict liability claims in Counts I and II to the limited extent that those claims related to inadequacies in the labeling and packaging of Benlate.

However, the circuit court did not grant the Liability Defendants' motion for partial summary judgment regarding preemption to the extent that the Plaintiffs were alleging liability in Counts I and II for the defective manufacture and design of Benlate. Furthermore, the circuit court expressly denied the Liability Defendants' motion for partial summary judgment regarding preemption issues with respect to the Plaintiffs' claim for breach of express warranty in Count III.

The Liability Defendants also moved for partial summary judgment to the extent that the Plaintiffs' express warranty claim in Count III sought to recover damages in excess of the limitation of liability provision within the express warranty on the Benlate label, which the circuit court denied. In denying this motion, the circuit court stated that "[t]he Court finds as a matter of law that the Benlate products warranty disclaimers and limitation of remedies provisions are unconscionable under the facts of this case." As a result of this ruling, the circuit court eventually instructed the jury to disregard the limitation of liability provision within the express warranty on the Benlate label.

The Liability Defendants moved several times to have the circuit court realign the Declaratory Defendants as plaintiffs. The circuit court denied these motions, because it found that the Declaratory Defendants were adverse to the Tomono Plaintiffs. As a result, during jury selection, the Liability Defendants had six of the defense's eight total peremptory challenges, and the Declaratory Defendants had the other two.

### D. Discovery

Discovery in this matter was very contentious. As the manufacturer of Benlate, DuPont had exclusive possession and control of the vast majority of documents relating to the defects in Benlate. The Plaintiffs' discovery requests sought hundreds of thousands of documents, including documents that DuPont claimed were privileged. In response to some of DuPont's objections, the Plaintiffs accused DuPont of stonewalling. From the commencement of discovery in November 1992, until the post-trial issuance of an amended punitive sanction order on May 16, 1995, the circuit court issued fifty-four discovery orders against DuPont. Of those

fifty-four discovery orders, twenty-seven imposed sanctions for discovery violations. Five of the orders contained findings that DuPont had intentionally withheld material evidence from the Plaintiffs. DuPont challenged the circuit court's discovery and other pre-trial orders by filing three petitions for writs of mandamus in this court in Case Nos. 17369, 17834, and 18004, which we denied.

### E. *The Trial*

The trial lasted seven months, from June 1994 to January 1995. The crux of the Plaintiffs' case was that a defect in Benlate had injured their plants, soils, and farm structures. The Plaintiffs asserted that: (1) Benlate had been contaminated with atrazine and sulfonylureas, which are herbicides, when the Liability Defendants manufactured it; and (2) the benomyl in Benlate produced phytotoxic substances called butyl isocyanate and/or dibutylurea. Because of these defects, the Benlate caused crop damage.

One of the controversies occurred during opening statements, when the Plaintiffs' counsel made a brief reference to a verdict against DuPont in another case entitled *Peterson Brothers, Inc. v. E.I. DuPont De Nemours and Co. and Greenlight Chemical Co.*, Case No. 91–CI–12100, 24th Judicial District Court of Bexar County, Texas. Following an objection, counsel for the Liability Defendants moved for a mistrial. After hearing the parties' arguments regarding the relevancy of the verdict to the instant case, the circuit court denied the motion.

There were at least three major discovery disputes during the trial, which occurred when Plaintiffs' counsel discovered relevant documents showing herbicide contamination of Benlate at numerous farms where Benlate had been applied. In each of these three major discovery disputes, DuPont had failed to either produce or properly identify documents in response to previous discovery requests and circuit court orders.

For example, during the trial in late July 1994, the Plaintiffs moved for sanctions against DuPont based upon their discovery of the deposition testimony of a DuPont employee, Dennis Keeler (Keeler), in a Benlate-related case in Florida entitled *Smith v. DuPont*, Case No. 92–240–CA, Third Circuit Court, Florida. At that deposition on June 8

and 9, 1994, Keeler had been shown a document that summarized the results of Benlate testing that DuPont had carried out or commissioned. Upon review of the document, Keeler had testified that the Benlate-testing summary appeared to be accurate. Keeler identified three sets of documents as containing nearly one hundred percent of all contamination test results of Benlate 50 DF. However, in the instant case, DuPont had not identified these Benlate test results in response to previous circuit court orders. As a result, the Plaintiffs moved for sanctions against DuPont, requesting, among other things, that the circuit court admit into evidence the Benlate-testing summary, an 84-page summary of contamination test results for Benlate DF manufactured from 1987 to 1991 (hereinafter referred to as Exhibit P–9369A). The circuit court granted the Plaintiffs' request to admit Exhibit P–9369A into evidence.

Several months later, Exhibit P–9369A became the source of the second major discovery dispute. When Keeler took the witness stand in the instant case in November 1994, the Plaintiffs showed him Exhibit P–9369A, and Keeler again vouched for its overall accuracy. However, the following month, nine days before the trial's conclusion, Plaintiffs discovered that, during yet another deposition in the Florida case, Keeler had produced a stack of documents that included four pages of Benlate test results that had not been included in Exhibit P–9369A. In response, the Plaintiffs again moved for sanctions against DuPont, arguing that DuPont had intentionally withheld those test results from the Plaintiffs. The circuit court agreed with the Plaintiffs that sanctions were appropriate because DuPont had not properly identified and produced the test results in response to the Plaintiffs' interrogatories. Accordingly, the circuit court sanctioned DuPont by, among other things, (1) allowing plaintiffs to introduce the four pages of test results into evidence in the trial as Plaintiffs' Exhibit K–41, and (2) allowing the Plaintiffs' counsel to read to the jury selected excerpts from Keeler's December 1994 Florida deposition testimony.

The third major discovery dispute during trial involved documents relating to scientific testing that Alta Analytical Laboratory, Inc., (Alta) had performed on DuPont's behalf in response to other Benlate-related litigation. Alta's testing sought to determine the validity of many Benlate-related claims nationwide regarding soil contamination resulting from Benlate application. Earlier in this case, DuPont had agreed to provide the Plaintiffs with the Alta test results relating to their own soils, but DuPont had invoked the work-product privilege with respect to the Alta test results relating to the soils of plaintiffs in other Benlate cases. Acting upon the recommendation of a discovery master, retired Judge Frank T. Takao (Discovery Master Takao), the circuit court ordered DuPont to produce the Alta test results (Alta documents) relating to all the other Benlate cases, subject to protective orders prohibiting Plaintiffs' counsel from distributing the Alta documents to plaintiffs' counsel in other Benlate cases. DuPont sought emergency review of the circuit court's decision compelling production of the Alta documents by petitioning this court for a writ of mandamus, but, in Case No. 17834, we denied the petition without prejudice.

The discovery dispute involving the Alta documents erupted in October 1994, during the defense phase of the trial, when the plaintiffs in a Benlate-related case in Texas [1] obtained six boxes of Alta documents, including material relating to testing of soils for Benlate contamination, that DuPont had failed to produce in the instant case in response to the Plaintiffs' previous discovery requests. The Plaintiffs discovered this fact and moved for sanctions against DuPont, alleging that DuPont should have previously produced all of these Alta documents during the discovery phase of this litigation pursuant to circuit court order. In response, the circuit court granted the Plaintiffs' motion for sanctions. The circuit court specifically found that DuPont's non-production of the Alta documents was intentional. As a sanction, the circuit court allowed the Plaintiffs to recall their principal causation witness, Dr. Jodie Johnson, to the stand to present his interpretation of the Alta documents to the

jury, and the circuit court barred DuPont's experts from offering any subsequent rebuttal testimony in response to Dr. Johnson's testimony; however, the Liability Defendants were allowed to use the depositions of two of DuPont's expert witnesses, Robert Betham and Robert Peterson, in cross-examining Dr. Johnson. In addition, because DuPont had violated a previous court order imposing sanctions against DuPont, the circuit court announced its intention to impose an additional punitive sanction against DuPont at a later date.

After the Liability Defendants rested, but prior to closing arguments, the circuit court held a hearing on the punitive sanctions on January 19, 1995. Finding that DuPont had intentionally withheld information and documents that it should have produced during discovery, the circuit court sanctioned DuPont by, among other things, (a) ordering DuPont to pay a $1.5 million fine to the State of Hawai'i, (b) lifting previous protective orders concerning the confidentiality of DuPont documents, with the exception of those documents that contained trade secrets, and (c) declaring that the circuit court would give the jury remedial instructions reflecting DuPont's discovery misconduct and explaining that Dr. Jodie Johnson was recalled in the Plaintiffs' case to testify regarding information that DuPont had withheld from the Plaintiffs. In its order, issued March 7, 1995, the circuit court stated the following:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The Court has considered the history of discovery in this case, the numerous motions to compel filed by Plaintiffs, and the remedial sanctions this Court has progressively imposed on Defendant Du Pont after *finding that Du Pont intentionally withheld information and documents that should have been produced during discovery.*

2. The Court has also considered the statements made by Judge Elliot and other Judges throughout the United States regarding Benlate litigation which is the subject of this lawsuit.

---

1. Although both the Plaintiffs and the Liability Defendants referred to this Benlate-related case in Texas, neither of them provided the title of this particular case.

3. The Court would note that there is no dispute that other Judges on the record have made strong statements to Du Pont regarding discovery abuse.

4. Of concern to the Court is the Dennis Keeler deposition which was held in June, 1994 on the mainland and this Court's subsequent Order receiving Exhibit P–9369A in evidence based upon the Court's finding that that *information should have been produced and was intentionally withheld by Du Pont.*

5. On December 30, 1994, Dennis Keeler was ordered to appear at a deposition pursuant to two (2) other Courts' orders in other cases on the mainland regarding information pertaining to Plaintiffs' 9369A.

6. This Court found that the information in P–9369A was responsive to Plaintiffs' discovery requests yet *Du Pont, even after being ordered to produce that information, did not update that information.* Plaintiffs discovered this information when Mr. Keeler was deposed on December 30, 1994.

7. Considering this Court's remedial, progressive sanctions, this Court's finding that Mr. Keeler's information was responsive and ordered to be produced, Defendant Du Pont's failure to produce the information, and the Court having reviewed the December 30, 1994 deposition of Dennis Keeler regarding the reasons why this information was not produced, *this Court again finds that Defendant Du Pont engaged in a pattern of discovery abuse.*

8. *Du Pont throughout this trial stonewalled.* In other words, as this Court stated previously, Du Pont cannot build a wall around each case and ignore information produced in those other cases. The issue in this case regarding whether or not Benlate is defective is similar to those other cases.

9. *Du Pont has engaged in what this Court would characterize as dump truck discovery. Forty (40) boxes of documents were "dumped" on Plaintiffs pursuant to an interrogatory request which made Plaintiffs come back to this Court asking Du Pont to specifically identify what documents were responsive to their interrogatories. Prior to that, this Court issued an Order that Du Pont cannot engage in such conduct.*

10. This Court ordered that Du Pont identify documents pertaining to Plaintiffs' interrogatories. This Court even went as far as saying if it pertains to so many pages that Du Pont must identify those specific pages. However, this Court did not enforce that specific requirement, recognizing as this case progressed, the numerous documents in this litigation, nor did Plaintiffs request five pages being responsive to an interrogatory.

11. This Court has also considered the privilege log that was produced to the Master and a copy which was produced to the Court which was not the same.

12. This Court finds that *this Court spent numerous hours over discovery motions.* This Court is not imposing any sanction for what a party in a litigation is entitled to pursue. However, *this Court is concerned about the abuse in a case of this magnitude.* The issues are complex enough without misconduct in discovery.

13. The Court would note that in a Federal Court Du Pont was conditionally sanctioned $500,000.00 which the Judge increased to $1 million dollars.

14. The Court would also note that there are other Benlate cases pending in the State of Hawaii and *in order to fashion a sanction that would deter Du Pont at least from acting the way it did in this State, the Court will order the following sanctions:*

A. In considering the totality of the conduct of Defendant Du Pont in this case, as well as the statements of the other Judges on the record from other jurisdictions[,] as referred to in Plaintiffs' memorandum and exhibits, not considering the orders that were vacated, and considering Du Pont's wealth and financial status, this Court finds that *in order to deter this type of discovery abuse, that Du Pont be sanctioned $1.5 million dollars.*

B. Du Pont shall pay Plaintiffs' attorneys' fees and costs which were incurred as a result of the discovery

abuse. Plaintiffs' counsel shall prepare and submit an affidavit regarding the attorneys' fees and costs incurred as a result of the discovery process;

C. *That the Protective Orders issued by this Court concerning the confidentiality of Du Pont documents be lifted with the exception of those documents which contain trade secrets;* and

D. As a remedial measure imposed as part of this punitive sanction, the Jury will be instructed as follows:

You are instructed that Dr. Jodie Johnson was recalled in the Plaintiffs' case to testify regarding information, which was requested before trial by the Plaintiffs and withheld by Defendant Du Pont.

Plaintiffs discovered this information after Dr. Johnson first testified.

(Emphases added.)

### F. *Jury Instructions*

Pursuant to its punitive sanctions order, the circuit court gave the following remedial instructions to the jury:

You are instructed that Dr. Jod[ie] Johnson was recalled in the Plaintiffs' case to testify regarding information which was requested before trial by the Plaintiffs and withheld by Defendant Du Pont. Plaintiffs discovered this information after Dr. Johnson first testified.

You are instructed that the test results contained in Plaintiffs' Exhibit P–9369A, responsive to Plaintiffs' interrogatories, were withheld from the Plaintiffs by Defendant Du Pont.

This information was requested by the Plaintiffs before the trial and should have been produced by Defendant Du Pont. Plaintiffs did not discover this evidence until July, 1994 after the start of this trial.

You are further instructed that the information in the Dennis Keeler deposition of December 30, 1994 relating to the contamination of Benlate packaged by Defendant Bartlo relevant to Plaintiffs' Exhibit P–9369A, including Plaintiffs' Exhibit K[-]41 responsive to Plaintiffs' interrogatories, was also withheld from Plaintiffs by Defendant Du Pont.

This information was requested by Plaintiffs before the trial and should have been produced by Defendant Du Pont. As a result Plaintiffs did not discover this evidence until January 1995.

In considering the issues of this case, you may consider Defendant Du Pont's withholding of this evidence and give it the weight, if any, you deem appropriate.

The Court also instructed the jury on the Plaintiffs' three distinct causes of action: (I) negligence and (II) strict liability in the design or manufacture of Benlate; and (III) breach of the express warranty on the Benlate label. The circuit court also specifically instructed the jury that it "may not find Defendants negligent or strictly liable for their failure, if any, to provide warnings on the Benlate label or packaging."

### G. *The Verdicts and Judgments*

On January 26, 1995, the jury returned verdicts in favor of the Plaintiffs on all three causes of action. More specifically, the jury found that: (1) "there was a defect in the manufacture or design of the Benlate sold to [the Plaintiffs]"; (2) the Liability Defendants were "engaged in the business of manufacturing, formulating, packaging, or selling such defective Benlate"; (3) "such defective Benlate [was] a legal cause of damage to [the Plaintiffs]"; (4) the Liability "Defendants [were] negligent with respect to Benlate"; (5) "such negligence [was] a legal cause of damage to [the Plaintiffs]"; (6) DuPont "breached [at least one of the] express warranties on the label regarding Benlate sold to [the Plaintiffs]"; and (7) DuPont's "breach of express warranty on the label [was] a legal cause of damages to [the Plaintiffs]."

With respect to the Plaintiffs' prayer for punitive damages, the jury found "by clear and convincing evidence that Defendant [Du-Pont] [wa]s liable for punitive damages[.]"

As a result, the jury awarded the following: $8,399,000 in compensatory damages and $12,500,000 in punitive damages to the Tomono Plaintiffs, and $1,180,000 in compensatory damages and $1,770,000 in punitive damages to Kawamata Farms. These awards were based on the injury to the Plaintiffs' crops.

The jury did not award any "soil restoration damages" and "farm structure restoration damages" to the Plaintiffs or the Declaratory Defendants. The jury found that, to the extent that any of the Plaintiffs were negligent, the Plaintiffs' negligence was not the legal cause of any damages. The jury also found that the Tomono Plaintiffs were not liable to the Declaratory Defendants for negligence, waste, or breach of contract. Accordingly, the jury awarded no damages to the Declaratory Defendants.

Because the Tomono Plaintiffs and the Liability Defendants prevailed with respect to the Declaratory Defendants' counterclaim and cross-claim, the circuit court awarded costs in favor of Tomono Plaintiffs and Liability Defendants and against the Declaratory Defendants as follows:

(1) with respect to the Tomono Plaintiffs, $7,654.16;

(2) with respect to DuPont, $11,072.59;

(3) with respect to Platte, United Agri Products, Loveland, and Hasegawa, $949.56; and

(4) with respect to Terra International, $1,182.06.

H. *Post–Trial Motions*

Shortly after the conclusion of the trial, DuPont and Bartlo Packaging, Inc. (Bartlo) moved for a new trial based on newly discovered evidence involving the alleged fraud, misrepresentation, or misconduct of the Plaintiffs. DuPont and Bartlo asserted that the Plaintiffs had concealed the involvement of two expert scientists, Dr. Harry K. Tayama and Dr. David S. Koranski, by having failed to identify either scientist in response to the Liability Defendants' discovery requests, and by having failed to assert any privilege. However, the circuit court denied the motion for a new trial because: (1) the circuit court had not ordered disclosure of these consultants or their work product; (2) in response to DuPont's past motion to compel discovery, the Plaintiffs had properly claimed work product privilege regarding the identities of the Plaintiffs' consultants; (3) the Plaintiffs had given DuPont an adequate opportunity to obtain Benlate samples from the Plaintiffs and to perform tests on those samples for presentation at trial; and (4)

even if the circuit court had ordered the disclosure of the experts' identities and their information, any testimony on the part of Drs. Tayama and Koranski would not have been material and controlling, nor would it have changed the outcome of the trial.

The Liability Defendants also filed a post-trial motion for judgment notwithstanding the verdict, contending that, because the jury concluded that the Plaintiffs' injuries were a result of "economic loss," rather than damage to the soil or farm structures, the economic loss doctrine precluded Plaintiffs from any recovery in tort as a matter of law. The circuit court denied the motion for judgment notwithstanding the verdict, concluding, among other things, that "[t]he majority of Plaintiffs' compensatory damages awarded by the jury were for plant replacement costs for the damages to Plaintiffs' plant inventory [that] constitutes 'other property,' which therefore brings this case out of the realm of the economic loss doctrine."

The Liability Defendants filed this timely appeal. On September 12, 1995, this court consolidated DuPont's interlocutory appeal from the sanctions order lifting all previously-entered protective orders, Case No. 18736, with this appeal.

Shortly after the jury verdict, the Plaintiffs discovered that, in the *Smith v. DuPont* case in Florida, DuPont had disclosed additional information regarding Benlate contamination that DuPont had intentionally failed to produce and/or identify in response to the Plaintiffs' interrogatories in the instant case. Based on this discovery, the circuit court amended its earlier punitive sanction order by, among other things, awarding the Plaintiffs additional attorneys' fees and costs and reaffirming the previous $1.5 million fine against DuPont.

Based upon this post-verdict discovery of further discovery misconduct on the part of DuPont, the Declaratory Defendants filed a motion for a new trial on May 26, 1995. On July 19, 1995, the circuit court denied the Declaratory Defendants' motion for a new trial, stating, in pertinent part, the following:

Defendants/Crossclaimants/Counterclaimants do not meet the three requirements for a new trial set forth in *Orso v.*

*City and County of Honolulu,* 56 Haw. 241, 250, 534 P.2d 489, 494 (1975). Defendants/Crossclaimants/Counterclaimants did not show due diligence in pursuing the discovery at issue since most frequently it took no position regarding discovery motions.

### I. *Post–Appeal Motions*

After the jury verdict in the instant case, significant developments took place in another of DuPont's Benlate-related cases, namely *In re E.I. du Pont de Nemours and Co.,* 918 F.Supp. 1524 (M.D.Ga.1995), *reversed, In re E.I. DuPont De Nemours & Company–Benlate Litigation,* 99 F.3d 363 (11th Cir.1996), *cert. denied, E.I. DuPont de Nemours and Company v. Bush Ranch, Inc.,* —— U.S. ——, 118 S.Ct. 263, 139 L.Ed.2d 190 (1997), also known as the *Bush Ranch* litigation. In the *Bush Ranch* litigation, the *Bush Ranch* plaintiffs sued DuPont in federal court for damages resulting from defective Benlate. After the case was submitted to the jury, the *Bush Ranch* plaintiffs offered to settle their claims, and DuPont agreed. On August 16, 1993, the *Bush Ranch* plaintiffs voluntarily dismissed their claims with prejudice.

After the settlement, the Plaintiffs in the instant case requested documents related to the testing of Benlate from the *Bush Ranch* litigation. DuPont resisted, but DuPont eventually produced the documents pursuant to a court order. Among the documents produced were some of the Alta documents, which DuPont had *not* produced in the *Bush Ranch* litigation. The Alta documents included analytical findings that some experts would construe as evidence that Benlate was contaminated with sulfonylureas.

As a result of the production of the Alta documents in the instant case, the *Bush Ranch* plaintiffs returned to the federal district court, more than a year and a half after the settlement of the *Bush Ranch* litigation, with a petition seeking sanctions against DuPont. The *Bush Ranch* plaintiffs charged that DuPont had intentionally withheld evidence of sulfonylurea contamination, which was in its possession and which the district court had ordered it to produce. Furthermore, the petition charged that DuPont had falsely represented to the district court and to the *Bush Ranch* plaintiffs that the Alta

documents it withheld contained no evidence of sulfonylurea contamination. On August 21, 1995, the district court agreed with the *Bush Ranch* plaintiffs and sanctioned DuPont by, among other things, ordering DuPont to either pay $101 million to the court or publish a judicially approved confession of guilt in selected newspapers across the United States. *In re E.I. DuPont De Nemours and Co.,* 918 F.Supp. at 1557–58.

After learning about these events in the *Bush Ranch* litigation, on August 31 and September 12, 1995, the Plaintiffs and the Declaratory Defendants in the instant case returned to the circuit court and filed motions, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b)(3), seeking to alter or amend the judgment based upon the newly discovered evidence of fraud, intentional misrepresentation, and other misconduct on the part of DuPont. The Plaintiffs and Declaratory Defendants also sought sanctions against DuPont. Although DuPont had eventually produced the Alta documents in the instant case pursuant to court orders and sanctions, DuPont had asserted that the Alta documents were privileged under the work product doctrine, and DuPont had represented to Discovery Master Takao that the *Bush Ranch* Alta documents had never been produced, proffered, or in any way used in any other Benlate trial. However, according to the transcripts of DuPont's attorneys' testimony in the *Bush Ranch* litigation, DuPont had actually waived the work product privilege with respect to the Alta documents during the *Bush Ranch* trial in July and August 1993. The Plaintiffs in the instant case claimed that: (1) DuPont's fraudulent assertion of the work product privilege had delayed their receipt of the Alta documents, and, thus, had prejudiced the Plaintiffs at trial; and (2) if the Plaintiffs had received the Alta documents earlier, the jury might have awarded soil remediation damages as well as an increased punitive damage award. The Plaintiffs sought, among other things, an award for the Plaintiffs' attorneys' fees and costs for the entire litigation.

On April 26, 1996, while the instant case was on appeal before this court, the circuit court issued a minute order stating its inten-

tion to grant the HRCP Rule 60(b)(3) motion and directing the Plaintiffs to file the necessary motion before this court for remand. Attached to that order was a sixty-page document setting forth findings of fact, conclusions of law, and a proposed order with respect to the Plaintiffs' HRCP Rule 60(b)(3) motion. That document announced, among other things, the following conclusions: (1) the circuit court had jurisdiction over the motion pursuant to HRCP Rule 60(b)(3) and the circuit court's inherent powers; (2) DuPont had engaged in discovery misconduct in this case by asserting the work product privilege with respect to the Alta *Bush Ranch* documents; and (3) that DuPont should be sanctioned. Among its many conclusions of law, the circuit court stated in conclusions of law 17, 22, 27, and 30 that specific representations by DuPont to the circuit court regarding production of the Alta *Bush Ranch* documents were fraudulent by clear and convincing evidence. The circuit court also specifically stated the following in conclusions of law 39 and 40:

> 39. This Court finds that *Du Pont's conduct* as set forth herein constitutes *abusive litigation practices* and specifically finds that such practices were done in *bad faith.* This Court may properly assess attorney's fees under its inherent authority under HRS § 603–21.9(1) and (6) (1985)..
>
> 40. This Court concludes that *Du Pont's conduct* set forth in the Findings of Fact herein demonstrates that *Du Pont engaged in fraud and intentional misconduct which abused the judicial process. Du Pont acted in bad faith,* wantonly and for oppressive reasons and, therefore, this Court has inherent authority to levy sanctions, award attorneys fees and costs, and correct judgments and orders.

(Emphases added.)

The circuit court also entered the following conclusion of law with respect to DuPont's past assertion that the Alta *Bush Ranch* documents were privileged under the attorney work product doctrine:

> 44. This Court finds based on all the evidence now available to the Court that *the ALTA Bush Ranch documents were never entitled to work product privilege in this case.* This Court also finds that *even if the ALTA Bush Ranch documents could*

*have been entitled to such a privilege claim, such a privilege claim was waived* in this case by Defendant DuPont by August 25, 1993.

(Emphases added.)

As its sanction, the circuit court proposed to: (1) award the Plaintiffs and the Declaratory Defendants additional attorneys' fees and costs incurred throughout the pre-trial, trial, and post-trial proceedings, relating to the misconduct, which had not been previously awarded as sanctions; (2) reaffirm its prior punitive sanctions order and the $1.5 million sanction; and (3) amend its earlier order to accurately reflect how the circuit court would have ruled if the circuit court had known of DuPont's misconduct at the time the orders were issued. The circuit court stated, among many other things, the following:

### III. ORDER

Based upon the above Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

A. The Judgments entered herein on May 16 and 17, 1995 are hereby amended to include the additional attorneys fees, costs and monetary Punitive Sanction as detailed below;

B. This Court's May 16, 1995 Amended Order Imposing Punitive Sanctions Against Defendant E.I. Du Pont De Nemours and Company, Inc. is hereby amended as follows:

> 1. . *Du Pont is ordered to pay Plaintiffs' and Declaratory Relief Defendants' attorneys fees and costs incurred throughout the pre-trial, trial and post-trial proceedings relating to the misconduct found herein which have not previously been awarded as sanctions,* including. all attorneys fees and costs for this motion and all proceedings attendant hereto. Plaintiffs shall submit affidavits of fees and costs and the Court shall thereafter issue a ruling regarding the amount to be awarded hereunder;

2. *This Court's previously issued $1.5 million dollar Punitive Sanction is hereby reaffirmed;*

C. This Court hereby reaffirms the remaining findings in the Court's May 16, 1995 Amended Order Imposing Punitive Sanctions Against Defendant E.I. Du Pont De Nemours and Company, Inc. not amended herein regarding Du Pont's pattern of discovery abuse and intentional conduct;

D. This Court hereby orders that the Orders listed in Section H of the Findings of Fact and Section L of the Conclusions of Law above shall be corrected as noted to accurately reflect what this Court would have ruled on those matters had this Court known of Du Pont's misconduct found herein at the time said Orders were issued.

In response to the Plaintiffs' motion for remand, this court issued an order on August 19, 1996, remanding this case to the circuit court for the purpose of allowing the circuit court to enter its findings of fact, conclusions of law, and order regarding the Plaintiffs' and Declaratory Defendants' motions for HRCP Rule 60(b)(3) relief and for sanctions against DuPont. This court's remand order also informed the parties that they could submit ten-page briefs limited to the propriety of the relief granted pursuant to the HRCP Rule 60(b)(3) motion. On August 22, 1996, the circuit court filed its findings of fact, conclusions of law, and an order regarding the Plaintiffs' and Declaratory Defendants' motions for Rule 60(b)(3) relief and for sanctions against DuPont.

## II. *DISCUSSION*

A. *The Circuit Court Did Not Allow the Jury to Impose Liability Based on FIFRA–Preempted Claims as a Result of Its Two Summary Judgment Rulings*

The Liability Defendants contend that the circuit court erroneously allowed the jury to consider liability based on claims that the FIFRA preempted by entering the following two orders: (1) on April 15, 1994, the circuit court issued an order partially granting the Liability Defendants' motion for partial summary judgment regarding FIFRA preemption issues; and (2) on June 9, 1994, the circuit court issued an order denying the Liability Defendants' motion for partial summary judgment as to breach of warranty claims. We disagree.

■ We review a circuit court's summary judgment order *de novo* under the same standard applied by the circuit court. *Maguire v. Hilton Hotels Corp.*, 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995).

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.

*Id.* (citations, emphasis, internal quotation marks, and original brackets omitted); *see* HRCP Rule 56(c).

The FIFRA, 7 U.S.C.A. §§ 136–136y (1992), is a comprehensive federal statute that regulates, among other things, fungicide use, sales, and labeling, and grants enforcement authority to the EPA. Under the FIFRA, no fungicide may be sold in the United States unless it is registered with the EPA. A manufacturer wishing to market its product must first petition the EPA for registration. 7 U.S.C.A. § 136a. The applicants for registration are responsible for submitting certain performance data to the EPA. 40 C.F.R. §§ 158.100–158.740 (1996). Labeling requirements are set forth in great detail. 40 C.F.R. § 156.10 (1996). The pesticide manufacturer must include a copy of a proposed label as part of the registration petition. 7 U.S.C.A. § 136a(c)(1)(C). If the label is not adequate or accurate, the pesticide is "misbranded," and the manufacturer is subject to various penalties, including revocation of registration. 7 U.S.C.A. §§ 136(q), 136j(a)(1)(F), 136k, 136l, 136m, and 136q. The FIFRA also authorizes the EPA to establish standards for the packaging of pesticides "in order to protect children and adults from serious injury or illness resulting from accidental ingestion or contact with pesticides or devices regulated by [the FIFRA] as

well as to accomplish the other purposes of [the FIFRA]." 7 U.S.C.A. § 136w(c)(3).

■ The Liability Defendants contend that the FIFRA, as the law of the United States, preempted the Plaintiffs' state law claims. The Supremacy Clause provides that the laws of the United States "shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2.

> Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law. Whether a state law establishing a cause of action is preempted in a given case is a question of congressional intent.

*Norris v. Hawaiian Airlines, Inc.*, 74 Haw. 235, 245–46, 842 P.2d 634, 639 (1992) (citations and internal quotation marks omitted), *aff'd*, 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994).

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation. Such reasoning is a variant of the familiar principle of *expressio unius est exclusio alterius:* Congress' enactment of a provision defining the preemptive reach of a statute implies that matters beyond that reach are not preempted.

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992) (citations and internal quotation marks omitted). Therefore, where Congress has included an express preemption clause in the statute, the analysis of preemption starts with the language of that provision. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, ——, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996).

> Although our analysis of the scope of the pre-emption statute must begin with its text, our interpretation of that language does not occur in a contextual vacuum.

Rather, that interpretation is informed by two presumptions about the nature of preemption.

> First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress....

> Second, our analysis of the scope of the statute's pre-emption is guided by our oft-repeated comment ... that the purpose of Congress is the ultimate touchstone in every pre-emption case. As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose. Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it. Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

*Id.* at —— – ——, 116 S.Ct. at 2250–51 (citations, internal quotation marks, original ellipsis points, and original brackets omitted).

■ The FIFRA contains an express preemption clause, which states the following:

§ 136v. Authority of States

(a) In general

A state may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

(b) Uniformity

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

7 U.S.C.A. § 136v. It is apparent from § 136v(a), as well as other statutory language, e.g., 7 U.S.C.A. § 136w–1, that the FIFRA does not wholly oust the states from pesticide regulation. However, it is equally apparent from § 136v(b) that the states cannot apply different or additional "requirements" for "labeling and packaging." In this context, the word "requirements" in § 136v(b) presumptively includes state common law tort causes of action as well as state laws and regulations. *See Medtronic,* —— U.S. at —— –——, 116 S.Ct. at 2251–53 (plurality opinion); *id.* at —— –——, 116 S.Ct. at 2259–60 (Breyer, J., concurring in part and concurring in judgment); *id.* at —— –——, 116 S.Ct. at 2262–63 (O'Connor, J., Rehnquist, C.J., and Scalia and Thomas, JJ., concurring in part and dissenting in part); *Cipollone,* 505 U.S. at 521–22, 112 S.Ct. at 2620–21 (plurality opinion); *id.* at 548–49, 112 S.Ct. at 2633–34 (Scalia and Thomas, JJ., concurring in judgment in part and dissenting in part).

■ Consequently, under § 136v(b), the FIFRA preempts any common law tort claim to the extent that the "claim depends upon inadequacies in labelling or packaging[.]" *Taylor AG Industries v. Pure–Gro,* 54 F.3d 555, 563 (9th Cir.1995) (citation and internal

quotation marks omitted). In accordance with prevailing case law, the circuit court in the instant case granted the Liability Defendants' motion for partial summary judgment regarding FIFRA preemption issues to the extent that the Plaintiffs' negligence, strict liability, and accompanying failure to warn claims in Counts I and II were based upon inadequacies in the labeling and packaging of Benlate.[2]

However, because the circuit court's order only partially granted summary judgment, the circuit court impliedly denied summary judgment with respect to the Plaintiffs' negligence and strict liability claims in Counts I and II for a defect in the manufacture or design of Benlate to the extent that these counts were not based on inadequacies in the labeling and packaging of Benlate. Furthermore, the order expressly denied summary judgment with respect to the Plaintiffs' claim in Count III alleging breach of express warranty.

As a result, based on Counts I and II, the jury eventually found that the Liability Defendants were liable under negligence and strict liability theories for a defect in the manufacture or design of Benlate.[3] Based on Count III, the jury also found that the Liability Defendants were liable for breach of express warranty.[4]

---

**2.** *See, e.g., Grenier v. Vermont Log Bldgs., Inc.,* 96 F.3d 559, 563–65 (1st Cir.1996); *King v. E.I. DuPont de Nemours and Co.,* 996 F.2d 1346, 1349 (1st Cir.), *cert. dismissed,* 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); *Lowe v. Sporicidin Int'l,* 47 F.3d 124, 129 (4th Cir.1995); *Worm v. American Cyanamid Co.,* 5 F.3d 744, 748 (4th Cir.1993); *MacDonald v. Monsanto Co.,* 27 F.3d 1021, 1024–25 (5th Cir.1994); *Shaw v. Dow Brands, Inc.,* 994 F.2d 364, 369–71 (7th Cir. 1993); *Bice v. Leslie's Poolmart, Inc.,* 39 F.3d 887, 888 (8th Cir.1994); *Taylor AG Industries v. Pure–Gro,* 54 F.3d 555, 560 (9th Cir.1995); *Arkansas–Platte & Gulf Partnership v. Van Waters & Rogers, Inc.,* 981 F.2d 1177, 1179 (10th Cir.), *cert. denied,* 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30 (1993); *Papas v. Upjohn Co.,* 985 F.2d 516, 518 (11th Cir.), *cert. denied,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *Barnes v. Sandoz Crop Protection Corp.,* 189 Ariz. 46, 938 P.2d 95, 97 (App.1997); *Hottinger v. Trugreen Corp.,* 665 N.E.2d 593, 598 (Ind.Ct.App. 1996); *Schuver v. E.I. DuPont de Nemours & Co. (Inc.),* 546 N.W.2d 610, 614–15 (Iowa), *cert. denied,* —— U.S. ——, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996); *Jenkins v. Amchem Products, Inc.,* 256 Kan. 602, 886 P.2d 869, 884 (1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 80, 133 L.Ed.2d

38 (1995); *Hochberg v. Zoecon Corp.,* 421 Mass. 456, 657 N.E.2d 1263, 1266–67 (1995); *Ackles v. Luttrell,* 252 Neb. 273, 561 N.W.2d 573, 579, *cert. denied,* —— U.S. ——, 118 S.Ct. 329, 139 L.Ed.2d 255 (1997); *Lewis v. American Cyanamid Co.,* 294 N.J.Super. 53, 682 A.2d 724, 728–32 (App.Div.1996), *cert. granted,* 151 N.J. 74, 697 A.2d 546 (1997); *Quest Chemical Corp. v. Elam,* 898 S.W.2d 819, 820–21 (Tex.1995); *Hue v. Farmboy Spray Co., Inc.,* 127 Wash.2d 67, 896 P.2d 682, 692 (1995); *All–Pure Chemical Co. v. White,* 127 Wash.2d 1, 896 P.2d 697, 701–02 (1995).

**3.** According to the two special verdict forms that the jury returned on January 26, 1995, the jury found the Liability Defendants liable under negligence and strict liability theories because: (a) "there was a defect in the manufacture or design of the Benlate" sold to the Plaintiffs; (b) the Liability "Defendants [were] negligent with respect to Benlate"; and (c) both the defective Benlate and the Liability Defendants' negligence were "legal cause[s] of damage to" the Plaintiffs.

**4.** According to the two special verdict forms that the jury returned on January 26, 1995, the jury

As stated, the Liability Defendants contend that the circuit court's refusal to grant all aspects of their motion for partial summary judgment regarding FIFRA preemption issues allowed the jury to impose liability based on claims that the FIFRA preempted. The Liability Defendants claim that, despite granting summary judgment with respect to the Plaintiffs' failure to warn claims, the circuit court instructed the jury that it could find the Liability Defendants liable for failing to warn the Plaintiffs about the defect in Benlate by any means other than the Benlate label. Case law is divided as to whether the FIFRA does [5] or does not [6] preempt failure to warn claims that are not directly based on the language of the label. However, we need not resolve this particular preemption issue because the Liability Defendants waived any errors in the circuit court's jury instructions regarding any theory of liability based upon a failure to warn by having failed to comply with the applicable Hawai'i Rules of Appellate Procedure (HRAP).

Under HRAP Rule 28(b)(4)(B), we require appellants to provide, among other things, the following:

> (4) A concise statement of the points on which appellant intends to rely, set forth in separate, numbered paragraphs. Each point shall refer to the alleged error committed by the court or agency upon which appellant intends to rely. The point shall show where in the record the alleged error occurred and where it was objected to and, where applicable, the following:
>
> . . . .
>
> (B) When the point involves the charge of the court, there shall be set out the specific words of the part referred to, whether it be instructions given or refused, together with the objections urged at the trial.

"Points not presented in accordance with this section will be disregarded, except that the court, at its option, may notice a plain error not presented." HRAP Rule 28(b)(4)(D).

In the section of their joint opening brief entitled "Statement of Points on Appeal," the

---

found that the Liability Defendants' "breach of express warranty on the label [was a] legal cause of damages to" the Plaintiffs.

5. *See, e.g., Worm v. American Cyanamid Co.*, 5 F.3d 744, 748 (4th Cir.1993) ("To allow the [plaintiffs] to argue that the warning language which appears on point-of-sale or other promotional material is inadequate when that language is identical to that approved by the EPA would in effect allow the establishment of an additional or different state law requirement concerning adequate warning language." (Citation omitted).); *Taylor AG Industries v. Pure–Gro*, 54 F.3d 555, 561 (9th Cir.1995) ("[W]e hold that Appellants' claim for inadequate point-of-sale warnings is preempted because their claim is premised ultimately upon the inadequacy of the product label."); *Papas v. Upjohn Co.*, 985 F.2d 516, 519 (11th Cir.) ("[A]ny claims that point-of-sale signs, consumer notices, or other informational materials failed adequately to warn the plaintiff necessarily challenge the adequacy of the warnings provided on the product's labeling or packaging."), *cert. denied*, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); *Goodwin v. Bacon*, 127 Wash.2d 50, 896 P.2d 673, 681 (1995) ("We agree with the majority of courts refusing to distinguish non-label failure to warn claims[.]" (Citation omitted.)).

6. *See, e.g., Miller v. E.I. DuPont de Nemours and Co.*, 880 F.Supp. 474, 479 (S.D.Miss.1994)

("[W]hile plaintiffs do suggest that Du Pont should have taken steps to warn of the fact of and dangers associated with the atrazine contamination of its Benlate DF, nothing about this claim implies that Du Pont should have included additional, different, or alternatively stated warnings on the Benlate product label."); *Burke v. Dow Chemical Co.*, 797 F.Supp. 1128, 1140 (E.D.N.Y.1992) ("If . . . warnings to the trade, warnings apart from labels or packaging, limitation on sales to professionals, or other protections falling generally within the ambit of warnings should have been used when the content of the label was fixed by [the] EPA[,] there remains a liability question for the trier of fact." (Citation omitted.)); *In re DuPont–Benlate Litigation*, 859 F.Supp. 619, 623 (D.P.R.1994) ("[W]hile claims of a failure to warn or communicate information about a regulated product are preempted by FIFRA, claims of a failure to warn about a defect of certain individual items are not foreclosed[.]"); *Macrie v. SDS Biotech Corp.*, 267 N.J.Super. 34, 630 A.2d 805, 813 (App.Div.) ("State law may require a pesticide manufacturer like defendant to take reasonable steps, either through instructions to its customers or directly through its own efforts, to assure that persons, like plaintiffs, who handle produce bought directly from farmers who have used [a fungicide], will be warned of its dangers, at least by receiving defendant's brochures in the form prescribed by the E.P.A."), *cert. denied*, 134 N.J. 565, 636 A.2d 522 (1993).

Liability Defendants failed to specifically assert any error regarding a jury instruction regarding a failure to warn theory of liability. The Liability Defendants failed to show where in the record any such jury instruction occurred, where it was objected to, and they also failed to set out the specific words of the part referred to, together with the objections urged at the trial. "[F]ailure to comply with HRAP [Rule] 28(b)(4) is alone sufficient to affirm the judgment of the circuit court." *O'Connor v. Diocese of Honolulu*, 77 Hawai'i 383, 385, 885 P.2d 361, 363 (1994); *Bettencourt v. Bettencourt*, 80 Hawai'i 225, 228, 909 P.2d 553, 556 (1995); *City & County of Honolulu v. Kailua Auto Wreckers, Inc.*, 66 Haw. 532, 533, 668 P.2d 34, 35 (1983).

■ Normally "the policies of this court are to permit litigants to appeal and to have their cases heard on the merits, where possible." *O'Connor*, 77 Hawai'i at 386, 885 P.2d at 364. However, the circuit court in the instant case specifically instructed the jury that they could "not find [the Liability] Defendants negligent or strictly liable for their failure, if any, to provide warnings on the Benlate label or packaging." We presume that the jury followed this jury instruction. *State v. Knight*, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996); *Sato v. Tawata*, 79 Hawai'i 14, 21, 897 P.2d 941, 948 (1995). Moreover, our review of the jury's special verdict forms indicates that the jury did not base its liability findings on a failure to warn theory. In light of these facts, we hold that the Liability Defendants' waived any errors in the circuit court's jury instructions regarding the theories of liability in Counts I, II and III by having failed to comply with HRAP Rule 28(b)(4)(B).

■ We next review whether the circuit court erred by impliedly denying the Liability Defendants' motion for partial summary judgment with respect to the allegations in Counts I and II that were not based on a failure to warn, i.e., the Plaintiffs' allegations of negligence and strict liability for the defective manufacture or design of Benlate. As the United States Court of Appeals for the Fourth Circuit noted, "[w]hatever might be said with regard to some common law actions, we fail to see how a state-imposed standard of care relating to product design, manufacture, testing, and the like,

can qualify as a labeling requirement under [the] FIFRA." *Worm v. American Cyanamid Co.*, 970 F.2d 1301, 1307 (4th Cir.1992). Thus, "[c]laims for negligent testing, manufacturing, and formulating [of a product] are not preempted [by the FIFRA]." *Worm v. American Cyanamid Co.*, 5 F.3d 744, 747 (4th Cir.1993); *see also Taylor AG Industries*, 54 F.3d at 561 ("Claims for negligent testing that are based solely upon the Manufacturers' testing or research practices, not related to advertising or promotion ... are not preempted by FIFRA." (Citation omitted.)). In addition to negligence claims, when a "claim for strict liability is based on theories of defective design and manufacture and not on a theory of inadequate labeling, it is not preempted by [the] FIFRA." *Reutzel v. Spartan Chem. Co.*, 903 F.Supp. 1272, 1281–82 (N.D.Iowa 1995).

Thus, in a product liability case very similar to the instant case, arising out of allegations that a defect in Benlate caused property damage, the United States District Court for the District of Puerto Rico concluded that "state claims of negligence in testing, manufacturing or formulating pesticides are not preempted [by the FIFRA]." *In re DuPont–Benlate Litigation*, 859 F.Supp. 619, 622 (D.P.R.1994). Furthermore, the FIFRA did not preempt the plaintiffs' strict liability claims alleging "that Benlate was defective or inadequately designed[.]" *Id.* at 623.

Other jurisdictions have similarly held that the FIFRA does not preempt negligence or strict products liability claims as long as they are not based on inadequacies in the product's labeling or packaging. *See, e.g., Arkansas–Platte & Gulf Partnership v. Dow Chem. Co.*, 886 F.Supp. 762, 766 (D.Colo.1995); *Kennan v. Dow Chem. Co.*, 717 F.Supp. 799, 811–12 (M.D.Fla.1989); *Jillson v. Vermont Log Buildings, Inc.*, 857 F.Supp. 985, 992 (D.Mass.1994); *Burt v. Fumigation Service and Supply, Inc.*, 926 F.Supp. 624, 631 (W.D.Mich.1996); *Bingham v. Terminix Int'l Co., L.P.*, 850 F.Supp. 516, 521–22 (S.D.Miss. 1994); *Fisher v. Chevron Chem. Co.*, 716 F.Supp. 1283, 1287–89 (W.D.Mo.1989); *Higgins v. Monsanto Co.*, 862 F.Supp. 751, 757–60 (N.D.N.Y.1994); *Wright v. Dow Chem. U.S.A.*, 845 F.Supp. 503, 511 (M.D.Tenn.

1993); *ISK Biotech Corp. v. Douberly,* 640 So.2d 85, 89 (Fla.Dist.Ct.App.1994), *review denied,* 651 So.2d 1194 (Fla.1995); *Hopkins v. American Cyanamid Co.,* 666 So.2d 615, 623 (La.1996); *Babalola v. Crystal Chems., Inc.,* 225 A.D.2d 370, 644 N.Y.S.2d 1, 2 (1996); *Hue v. Farmboy Spray Co., Inc.,* 127 Wash.2d 67, 896 P.2d 682, 693 (1995) (en banc).

■ Likewise, we hold that the FIFRA did not preempt the Plaintiffs' claims in Counts I and II alleging negligence and strict liability for the Liability Defendants' defective manufacture or design of Benlate. Therefore, the circuit court did not err by impliedly denying the Liability Defendants' motion for partial summary judgment with respect to these allegations in Counts I and II.

■ The Liability Defendants next contend that the circuit court erred in its summary judgment order by expressly denying summary judgment regarding FIFRA issues with respect to the Plaintiffs' claim in Count III alleging breach of express warranty, because the FIFRA preempted such a claim. As a general rule, a "state law claim for breach of an express warranty is preempted by FIFRA" when the "express warranty claim ar[i]se[s] solely on the basis of a labeling statement specifically *required* by federal law *and approved* by the EPA." *Welchert v. American Cyanamid, Inc.,* 59 F.3d 69, 73 (8th Cir.1995) (emphases added); *Worm,* 5 F.3d at 749. However, preemption "does not extend to all express warranty claims made under [the] FIFRA." *Taylor AG Industries,* 54 F.3d at 563. Some federal appellate courts have suggested that the FIFRA might preempt breach of express warranty claims only with respect to label statements that the FIFRA *requires,* and, thus, are EPA mandated, as opposed to label statements that manufacturers have voluntarily put on their labels, and, thus, are merely EPA approved. *See, e.g., Welchert,* 59 F.3d at 73; *Papas v. Upjohn Co.,* 985 F.2d 516, 519 (11th Cir.), *cert. denied, Papas v. Zoecon Corp.,* 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993).

Such courts, in turn, have generally referred to *Cipollone,* 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407, in which the United States Supreme Court analyzed the issue of federal preemption with respect to the Federal Cigarette Labeling and Advertising Act (FCLAA) and the Public Health Cigarette Smoking Act of 1969 (PHCSA), 15 U.S.C. §§ 1331–1340. Through the FCLAA and the PHCSA, the federal government has regulated cigarette advertising on a nationwide basis. The preemption clause in the FCLAA, which Congress enacted in 1965, was somewhat narrow, stating in pertinent part that "[n]o statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Id.* at 514, 112 S.Ct. at 2616 (citation and internal quotation marks omitted). The preemption clause in the PHCSA, which Congress enacted in 1969, was much broader, stating that "[n]o requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Id.* at 515, 112 S.Ct. at 2616 (citation and internal quotation marks omitted). The issue arose whether the preemption clauses in the FCLAA and the PHCSA barred a plaintiff's action against three cigarette companies for the death of the plaintiff's mother, who had suffered lung cancer as a result of smoking cigarettes, because, among his causes of action, the plaintiff based his claim for breach of express warranty on many statements that the cigarette manufacturers made in their advertisements. After concluding that the FCLAA only preempted state and federal rule-making bodies from mandating particular cautionary statements and did not preempt state-law damages actions, *id.* at 519–20, 112 S.Ct. at 2619, Justice Stevens, in a plurality opinion joined by three other members of the court, explained why the plaintiff's breach of express warranty claim also survived preemption under the PHCSA:

A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. Accordingly, *the requirements imposed by an express warranty claim are not imposed under State law, but rather imposed by the warrantor.* If, for example,

a manufacturer expressly promised to pay a smoker's medical bills if she contracted emphysema, *the duty to honor that promise* could not fairly be said to be imposed under state law, but rather *is best understood as undertaken by the manufacturer itself. While the general duty not to breach warranties arises under state law,* the particular requirement based on smoking and health with respect to the advertising or promotion of cigarettes in an express warranty claim arises from the manufacturer's statements in its advertisements. In short, *a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a requirement imposed under State law* within the meaning of § 5(b) [of the PHCSA].

That the terms of the warranty may have been set forth in advertisements rather than in separate documents is irrelevant to the pre-emption issue (though possibly not to the state-law issue of whether the alleged warranty is valid and enforceable) because, *although the breach of warranty claim is made with respect to advertising, it does not rest on a duty imposed under state law.* Accordingly, to the extent that petitioner has *a viable claim for breach of express warranties* made by respondents, that claim *is not pre-empted* by the [PHCSA].

*Id.* at 525–27, 112 S.Ct. at 2622–24 (emphases added) (footnotes, internal quotation marks, brackets, ellipses points, and original brackets omitted).

As a direct result of *Cipollone,* the United States Court of Appeals for the Eleventh Circuit suggested, but did not hold, that the FIFRA might not preempt a claim that a manufacturer breached an express warranty if the FIFRA did not require the language comprising the express warranty, because a warrantor undertakes such a warranty voluntarily:

> Express warranties are promises that are made in some, but not all, sales contracts. Express warrantors seek competitive advantage by promising buyers that certain factual representations about their goods are true. Liability for breach of an express warranty has a voluntary quality;

it derives from, and is measured by, the terms of that warranty.

*Papas,* 985 F.2d at 519 (citation and internal quotation marks omitted). However, the issue before the *Papas* court was whether the FIFRA preempted a breach of *implied* warranty claim, rather than a breach of express warranty claim. The *Papas* court went on to hold that, "[a]lthough liability for breach of an express warranty may be viewed as imposed by the warrantor, ... liability for breach of an implied warranty is based on the agreement, imposed by law, to be responsible in the event the thing sold is not in fact fit for the use and purposes intended[,]" and, thus, "to the extent the implied warranty claim depends upon inadequacies in labelling or packaging, FIFRA section 136v pre-empts the claim." *Id.* at 519–20 (citations and internal quotation marks omitted).

The United States Court of Appeals for the Eighth Circuit also suggested, but did not hold, that the FIFRA would not preempt a plaintiff's breach of express warranty claim as long as the language comprising the express warranty was voluntarily assumed, i.e., the language in the express warranty was not both required by the FIFRA and approved by the EPA. *Welchert,* 59 F.3d at 73 (acknowledging that the scope of FIFRA preemption of breach of express warranty claims is limited to language on labels that the EPA both requires and approves). However, in *Welchert,* "because the [plaintiffs'] state law express warranty claim challenge[d] only language specifically required and approved by the EPA, the exception for voluntarily undertaken commitments provided by the *Cipollone* plurality [could not] be applied ... to save the [plaintiffs'] express warranty claim from preemption." *Id.* (footnote and internal quotation marks omitted).

Although no federal appellate court has expressly held that the FIFRA does not preempt a claim for the breach of a voluntarily assumed warranty, at least seven federal district courts and one state appellate court have taken the position that "express warranties that are voluntarily assumed survive preemption despite their relationship to labeling." *Higgins,* 862 F.Supp. at 760; *Roberson v. E.I. DuPont De Nemours & Co.,*

863 F.Supp. 929, 933–34 (W.D.Ark.1994); *Prather v. Ciba–Geigy Corp.*, 852 F.Supp. 530, 532 (W.D.La.1994) ("[W]here a pesticide manufacturer or retailer has voluntarily warranted a product's fitness for a particular purpose, courts have permitted plaintiffs to assert state law claims for breach of this warranty."); *Jillson*, 857 F.Supp. at 990; *Kenepp v. American Edwards Laboratories*, 859 F.Supp. 809, 817 (E.D.Pa.1994); *Sowers v. Johnson & Johnson Medical, Inc.*, 867 F.Supp. 306, 313–14 (E.D.Pa.1994); *In re DuPont–Benlate Litigation*, 859 F.Supp. at 623; *Babalola*, 644 N.Y.S.2d at 3; *see also Brennan v. Dow Chemical Co.*, 613 So.2d 131, 132 (Fla.Dist.Ct.App.1993) (The "FIFRA does not preempt the breach of warranty claim, since it was a common law claim arising out of a voluntary contractual commitment.").

For example, in an action against manufacturers of pesticides and insecticides, the *Higgins* court held that the FIFRA did not preempt the plaintiff's claim for breach of the manufacturers' voluntarily assumed express warranty, despite its relationship to labeling:

Express warranties are not grounded in state law, but rather, are voluntarily assumed obligations commonly employed to gain competitive advantage in the marketplace. As such, their very nature contradicts the wording of 7 U.S.C. § 136v(b), which dictates that a "state shall not impose or continue in effect" requirements on labeling. 7 U.S.C. § 136v(b) (emphasis supplied). Therefore, based on strict statutory interpretation, express warranties that are voluntarily assumed survive preemption despite their relationship to labeling.

It has been argued that express warranties are preempted because they are enforced through state contract law. We find this argument unpersuasive on three counts. First, the *Cipollone* majority clearly dictates that when Congress enacts a preemption clause, matters beyond its scope are not preempted; preemption clauses are to be narrowly construed. Since § 136v(b) [of the FIFRA] specifically prohibits state regulations from controlling labeling, but does not address self-imposed obligations enforced by [s]tates, courts are to interpret the latter as surviving preemp-

tion. Second, if states are not permitted to enforce express warranties that relate to labeling, warrantors will have less freedom in which to compete in the marketplace. Third, if an individual's only legal recourse is to bring a claim under [the] FIFRA, express warranties covering subjects outside the scope of the [FIFRA] will be futile. This court therefore holds that the Plaintiff's express warranty claims, to the extent that they are based on voluntarily assumed express warranties, are actionable.

*Higgins*, 862 F.Supp. at 760 (citations and footnotes omitted). The *Higgins* court especially noted the stark distinction between warranties that the EPA mandates and warranties that the EPA merely approves.

First, express warranties have a voluntary quality, which is missing if they are mandated by [the] EPA. The rationale that warrantors should be held to contracts that they voluntarily enter into does not apply when their actions are forced. Second, express warranties are not enforceable through state contract law if Congress has expressly preempted the law or has completely occupied the law's field of operation, as is the case with EPA mandated labeling. Based on the foregoing justifications, we hold that EPA mandated warranties are preempted.

*Id.* at 761 (citations omitted). Although the defendant in *Higgins* did not argue that the express warranties at issue were EPA mandated, the defendant did argue that the FIFRA preempted the plaintiff's claim for breach of express warranties because "they were EPA approved." *Id.* However, the *Higgins* court held that mere EPA approval of an express warranty on the label of a pesticide or insecticide product did not necessitate preemption under the FIFRA for three reasons:

First, a warranty does not lose its voluntary quality through EPA approval. Second, the mere fact that Congress gives [the] EPA the power to approve labels does not indicate that the legislative body necessarily intended that [the] EPA control over express warranties designated on the labels. Third, ... cases [such as *Ci-*

*pollone* ] suggest that when warranties are EPA approved but not EPA mandated, Congress has not attempted to occupy an entire field and has not expressly preempted the claims. Therefore, since [the] Plaintiff's express warranty claims are not required by [the] EPA, they do not warrant an exception to the general preemption analysis. This court finds that [the] Plaintiff's express warranty claims survive preemption.

*Id.* (citations and footnote omitted).

■ Likewise, in the instant case, the Plaintiffs' breach of express warranty claim survived preemption. The Liability Defendants' warranty on the Benlate label stated the following:

### NOTICE OF WARRANTY

*Du Pont warrants that this product conforms to the chemical description on the label thereof and is reasonably fit for purposes stated on such label only when used in accordance with the directions under normal use conditions.* It is impossible to eliminate all risks inherently associated with the use of this product. Crop injury, ineffectiveness or other unintended consequences may result because of such factors as weather conditions, presence of other materials, or the manner of use or application, all of which are beyond the control of Du Pont. *In no case shall Du Pont be liable for consequential, special or indirect damages resulting from the use or handling of this product. All such risks shall be assumed by the Buyer. DU PONT MAKES NO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE NOR ANY OTHER EXPRESS OR IMPLIED WARRANTY EXCEPT AS STATED ABOVE.*

(Emphases added). The Liability Defendants have not asserted in this appeal that the above language did not constitute an enforceable "express warranty" under HRS § 490:2–313 (1993), and, thus, the Liability Defendants have waived this potential issue. However, even assuming that it was an enforceable express warranty under state law, the State of Hawai'i did not impose this express warranty upon the Liability Defendants; the Liability Defendants voluntarily imposed it upon themselves. As Justice Stevens noted in *Cipollone:*

> That a contract has no legal force apart from the state law that acknowledges its binding character ... does not mean that every contractual provision is imposed under State law. To the contrary, common understanding dictates that a contractual requirement, although only enforceable under state law, is not imposed by the State, but rather is imposed by the contracting party upon itself.

*Cipollone,* 505 U.S. at 526 n. 24, 112 S.Ct. at 2622 n. 24 (citation, internal quotation marks, and brackets omitted).

Furthermore, the Liability Defendants did not even attempt to cite any section of the FIFRA or any federal regulations that might possibly have required the Liability Defendants to post an express warranty on their Benlate label. In fact, the Liability Defendants conceded in their joint opening brief that "DuPont was under no obligation to provide that [express] warranty in the first place, and was thus free to limit its scope." Liability Defendants' Joint Opening Brief at 25 n. 6. Because the Liability Defendants affirmatively waived this potential issue, there is no dispute that they voluntarily assumed the express warranty on the Benlate label, and, thus, although it was EPA approved, it was not EPA mandated under the FIFRA. Accordingly, we hold that the FIFRA did not preempt the Plaintiffs' claim for breach of express warranty, and we affirm the circuit court's order denying the Liability Defendants' motion for partial summary judgment with respect to the Plaintiffs' claim in Count III for breach of express warranty.

■ The Liability Defendants' final argument relating to FIFRA preemption arises out of the fact that, after the circuit court partially granted their motion for partial summary judgment regarding FIFRA preemption issues, the circuit court issued an unlawful order denying the Liability Defendants' subsequent motion for partial summary judgment as to breach of warranty claims, which stated in pertinent part:

> IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1. The Court finds as a matter of law that the Benlate products['] warranty disclaimers and limitation of remedies provisions are unconscionable under the facts of this case.

The Liability Defendants assert that, by concluding that the limitation of liability clause in the express warranty was unconscionable, the circuit court did not limit itself to merely enforcing that warranty as written; it altered the Benlate label to enlarge and enhance DuPont's contractual obligations and thereby violated the FIFRA. We disagree.

We initially note that the Liability Defendants do not assert error in the circuit court's conclusion that the language of the limitation of liability clause was unconscionable. Rather, they assert that this conclusion altered the Benlate label and enlarged DuPont's contractual obligations, and, thus, that the FIFRA preempted the circuit court from mandating such a result.

We further note that the Liability Defendants have waived any errors in jury instructions that might have resulted from this particular summary judgment order, because the Liability Defendants have failed to comply with HRAP Rule 28(b)(4)(B).

The circuit court clearly differentiated between the express warranty, the limitation of liability clause, and the warranty disclaimer when it crafted its order denying the Liability Defendants' motion for partial summary judgment based on breach of warranty claims. Under its notice of warranty, the label stated:

Du Pont warrants that this product conforms to the chemical description on the label thereof and is reasonably fit for purposes stated on such label only when used in accordance with the directions under normal use conditions.

This, clearly, was an express warranty. With respect to the Liability Defendants' argument that the summary judgment order violated the FIFRA by altering the Benlate label and enlarging DuPont's contractual obligation, we reiterate that, by their own admission, the Liability Defendants voluntarily assumed the express warranty on the Benlate label. Because the EPA did not require an express warranty pursuant to the FIFRA, the FIFRA did not preempt the circuit court

from interpreting the terms of the express warranty.

The label also stated:

In no case shall Du Pont be liable for consequential, special, or indirect damages resulting from the use or handling of this product. All such risks shall be assumed by the Buyer.

This section was clearly intended to limit Du Pont's liability with respect to damages sustained by consumers as a result of their use of the product.

The label further stated:

Du Pont makes no warranties of merchantability or fitness for a particular purpose nor any other express or implied warranty except as stated above.

As noted by the trial judge, this was a warranty disclaimer. Neither the warranty disclaimer nor the limitation of liability clause were required by the FIFRA and, therefore, escape preemption by FIFRA. The circuit court's conclusion that the limitation of liability clause was unconscionable did not infringe upon the FIFRA by forcing the Liability Defendants to remove or alter the Benlate label; it simply deemed the limitation of liability clause and the warranty disclaimer unenforceable. The Liability Defendants were free to leave it on their label.

The circuit court's ruling neither enlarged nor enhanced the contractual obligations of the Liability Defendants under the express warranty because the order of the circuit court did not speak to the express warranty; it referred only to the limitation of liability clause and the warranty disclaimer. By holding that the limitation of liability clause and the warranty disclaimer were unconscionable, the circuit court did not expand the Liability Defendants' duties under tort law because those obligations and duties already existed prior to the issuance of the circuit court's order.

■■■ The circuit court did not violate the FIFRA by concluding that the limitation of liability clause and the warranty disclaimer were unconscionable. The FIFRA cannot be interpreted to allow a manufacturer to avoid tort liability merely by placing a disclaimer on a label. In other words, a manufacturer

of a fungicide cannot escape tort liability by placing a disclaimer on a label and then claiming preemption under the FIFRA.

Accordingly, we affirm the circuit court's orders (1) partially granting the Liability Defendants' motion for partial summary judgment regarding FIFRA preemption issues, and (2) denying the Liability Defendants' motion for partial summary judgment as to breach of warranty claims. *Maguire*, 79 Hawai'i at 112, 899 P.2d at 395. Furthermore, we hold that the circuit court did not, as a result of these two summary judgment orders, allow the jury to impose liability pursuant to claims that the FIFRA preempted.

### B. *Whether the Circuit Court Denied the Liability Defendants a Fair Trial*

The Liability Defendants contend that the circuit court denied the Liability Defendants a fair trial through the cumulative effect of the following three alleged errors: (1) sanctioning one of the Liability Defendants, DuPont, for its discovery misconduct by instructing the jury that it could consider DuPont's discovery misconduct in deciding the merits of the case; (2) denying the Liability Defendants' motions to realign the parties; and (3) denying the Liability Defendants' motion for a mistrial after counsel for the Plaintiffs referred to a verdict against DuPont in another case. We disagree.

■■■ The fourteenth amendment to the United States Constitution and article 1, section 5, of the Hawai'i Constitution guarantee that no person shall be deprived of life, liberty, or property without due process, "and a fair trial in a fair tribunal is a basic requirement of due process." *State v. Brown*, 70 Haw. 459, 466, 776 P.2d 1182, 1187 (1989) (citation, internal quotation marks, and original brackets omitted). Thus, the Liability Defendants draw our attention to *State v. Soares*, 72 Haw. 278, 815 P.2d 428 (1991), as an example of how the cumulative effect of errors can result in the denial of a fair trial. In *Soares*, "[a]lthough no single instance of prosecutorial misconduct substantially prejudiced appellants' right to a fair trial," we held "that the cumulative weight of the prosecutor's improper conduct was so prejudicial as to deny appellants a fair trial." *Id.* at 283, 815 P.2d at 431. As our individual analysis

of the three instances of alleged errors shows, in two instances, the circuit court did not err, and, in the third instance, the circuit court's error was harmless. In light of the overwhelming and substantial evidence supporting the jury's verdict, we hold that the cumulative effect of the three alleged errors did not deny the Liability Defendants their constitutional right to a fair trial.

### 1. *The Circuit Court's Instruction that the Jury Could Consider DuPont's Discovery Misconduct in Deciding the Merits of the Case*

■■■ With respect to the Liability Defendants' contention that the circuit court deprived them of their right to a fair trial by giving the jury an erroneous remedial jury instruction, we initially note that a "circuit court is given broad discretion in determining the sanctions to be imposed pursuant to [HRCP] Rule 37(b)(2)." *Wong v. City and County of Honolulu*, 66 Haw. 389, 394, 665 P.2d 157, 161 (1983). A circuit "court's imposition of a discovery abuse sanction is reviewable on appeal for abuse of discretion. A [circuit] court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Aloha Unlimited, Inc. v. Coughlin*, 79 Hawai'i 527, 532–33, 904 P.2d 541, 546–47 (App.1995) (citation and internal quotation marks omitted).

The circuit court gave the remedial jury instruction as a sanction for DuPont's discovery misconduct involving the Alta documents. In October 1994, during the defense phase of the trial, the Plaintiffs learned that plaintiffs in a Benlate-related case in Texas had obtained six boxes of Alta documents relating to testing of soils for Benlate contamination that DuPont had failed to produce in response to previous discovery requests by the Plaintiffs in the instant case. As a result, the Plaintiffs moved for sanctions against DuPont, alleging that DuPont should have previously produced all of these Alta documents during the discovery phase of this litigation. The circuit court granted the Plaintiffs' motion, finding that DuPont had intentionally withheld the information and documents. The circuit court eventually

sanctioned DuPont by, among other things, reading the following remedial instruction to the jury: "In considering the issues of this case, you may consider Defendant Du Pont's withholding of this evidence and give it the weight, if any, you deem appropriate." The Liability Defendants contend that, in so doing, the circuit court erred because the remedial jury instruction, in effect, allowed the jury to impose sanctions against the Liability Defendants.

 Under HRCP Rule 37(b)(2), the circuit court may sanction a party for failing to comply with a discovery order. In addition to its authority under HRCP Rule 37(b)(2), a circuit court may sanction parties for abusive litigation practices in a proceeding before it in accordance with HRS § 603–21.9(1) and (6) (1993) and its inherent powers. *Azer v. Courthouse Racquetball Corp.*, 9 Haw.App. 530, 549, 852 P.2d 75, 86 (1993). For example, under HRS § 603–21.9(1) and (6),

[t]he several circuit courts shall have power:

(1) To make and issue all orders and writs necessary or appropriate in aid of their original or appellate jurisdiction;

. . . .

(6) To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

Additionally, we have specifically noted that courts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them. Inherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute. Among courts' inherent powers are the powers to create a remedy for a wrong even in the absence of specific statutory remedies, and to prevent unfair results. The courts also have inherent power to curb abuses and promote a fair process which extends to the preclusion of evidence and may include dismissal in severe circumstances. It follows that if the trial court has the inherent power to level the ultimate sanction of dismissal, it necessarily has the power to take all reasonable steps short of dismissal, depending on the equities of the case.

*Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994) (citations, internal quotation marks, original brackets, and footnote omitted).

The Plaintiffs in the instant case cite *Richardson* in support of their position that the circuit court did not err by giving the remedial jury instruction. In *Richardson,* the plaintiff suffered an injury in a hotel when she knelt down on a staple hidden in the carpeting of a hotel conference room. Although the defendant hotel failed to comply with discovery by not producing an original copy of an incident report that the hotel manager had prepared as a result of the accident, the trial court rejected the plaintiff's proposed remedial jury instruction addressing the defendant's discovery misconduct:

During the testimony of [the defendant]'s employee Mary Guerrero, a copy of an Incident Report which Mary Guerrero testified she wrote was marked as Plaintiff's Exhibit 25. The original Incident Report written by Mary Guerrero was and still may be in the custody and control of [the defendant], but the original document was never produced by [the defendant]. The original document may have contained information different from the information in Exhibit 25. The jury may consider the absence of the original Incident Report and [the defendant]'s failure to produce the original report in its deliberations, and may infer from the absence of the original report that it contained information favorable to the Plaintiffs in this case.

*Id.* at 506, 880 P.2d at 181. However, on appeal, we specifically noted that the "trial court had the inherent power to provide a remedial jury instruction addressing the loss of the original incident report if it deemed such a measure appropriate." *Id.* at 508, 880 P.2d at 183. In reaching our holding, we reiterated three factors that we had utilized in determining whether a discovery sanction

was appropriate: (1) the offending party's culpability, if any, in destroying or withholding discoverable evidence that the opposing party had formally requested through discovery; (2) whether the opposing party suffered any resulting prejudice as a result of the offending party's destroying or withholding the discoverable evidence; and (3) the inequity that would occur in allowing the offending party to accrue a benefit from its conduct. *Id.* at 507, 880 P.2d at 182.

■ Applying these three factors to the instant case: (1) the circuit court specifically found that DuPont had intentionally withheld numerous documents in blatant violation of previous court orders compelling discovery of those documents; (2) because the documents could be interpreted as demonstrating liability on the part of the Liability Defendants, DuPont's withholding these documents prejudiced the Plaintiffs; and (3) it would be inequitable for DuPont to benefit from its own discovery misconduct and the Plaintiffs' inability to acquire possession of inculpating documents prior to the commencement of trial. Based on the three factors that we utilized in *Richardson*, severe sanctions against DuPont for its inexcusable discovery misconduct were clearly justified.

■ However, the facts of *Richardson* are distinguishable from the instant case. While the defendant in *Richardson* never produced the original copy of the incident report, DuPont eventually did produce, albeit belatedly, the Alta documents. Furthermore, the power to sanction a party for discovery misconduct is within the exclusive province of the circuit court, not the jury. This is self-evident from a reading of HRCP Rule 37(b), which allows the circuit court to sanction a party that fails to "obey an order to provide or permit discovery." *See also* HRS §§ 603–21.9(1) and (6) (1993). The circuit court disregarded this principle and, thus, abused its discretion by instructing the jurors that they could consider DuPont's withholding of the Alta documents and give it any weight they deemed appropriate.

■ Nevertheless, in light of the overwhelming evidence that supported the jury's verdict, a California appellate court's decision in *Vallbona v. Springer*, 43 Cal.App.4th 1525, 51 Cal.Rptr.2d 311 (1996), is instructive. In *Vallbona*, a physician's former patients alleged fraud against the physician, his wife, and a clinic. The physician had performed a controversial medical procedure, and, although he initially claimed that he had indirectly applied for federal approval of the controversial medical procedure, he subsequently took the position that he could not comply with the plaintiffs' discovery requests to produce the application documents because the documents had been stolen. However, some of the purportedly stolen documents eventually turned up during trial. As a result, the trial court sanctioned the physician by instructing the jury that the physician had no pending application for federal approval of his disputed medical procedure and no empirical data to substantiate his claims in his brochures on the medical procedure rather than otherwise allowing the jurors to make this factual determination for themselves. *Id.* 51 Cal.Rptr.2d at 325. On appeal, the California Court of Appeals held that the trial "court acted within its discretion [by] imposing the issue sanction tailored to the defendants' particular discovery misuse and in implementing that sanction by instructing the jury that various facts should be taken as established against defendants." *Id.* at 326–27. More significantly, however, the *Vallbona* court stated that "even if we deemed the challenged special jury instruction to be error, we would conclude defendants suffered no prejudice since on this record it is not reasonably likely an outcome more favorable to defendants would have resulted absent any such error." *Id.* at 327.

■ We agree with the *Vallbona* court's statement that, even when a trial court abuses its discretion in a civil trial by giving the jury an inappropriate remedial instruction, we will nevertheless affirm the jury's verdict when it appears from the record as a whole that it is not reasonably likely that an outcome more favorable to the defendant would have resulted absent the error, and, thus, the defendant suffered no prejudice. As we have previously stated, "erroneous instructions are presumptively harmful and are a ground for reversal *unless* it affirmatively appears from the record as a whole that the error was not prejudicial." *State ex rel. Bronster v. United States Steel Corp.*, 82

Hawai'i 32, 51, 919 P.2d 294, 313 (1996) (emphasis added) (citations and internal quotation marks omitted).

The evidence adduced at trial overwhelmingly supported the jury's verdict regarding liability, damages, and punitive damages. We hold that, under the circumstances of this case, it affirmatively appears from the record as a whole that DuPont and the other Liability Defendants did not suffer prejudice as a result of the circuit court's inappropriate remedial jury instruction. Thus, although the circuit court abused its discretion through this particular sanction, we hold that the circuit court's error was harmless.

### 2. The Circuit Court's Denial of the Liability Defendants' Motions to Realign the Parties

The Liability Defendants contend that the circuit court denied the Liability Defendants a fair trial by denying the Liability Defendants' motions to realign the parties. We disagree.

A circuit court has the discretion to realign the parties at any stage of the action and on such terms as are just. *Cawthon v. Waco Fire and Cas. Ins. Co.*, 259 Ga. 632, 386 S.E.2d 32, 33 (1989). A trial court's ruling on a motion for realignment is reviewed under the abuse of discretion standard. *Id.*

Although the Liability Defendants assert that the circuit court's failure to realign the parties resulted in "manifest and severe prejudice" to DuPont and the other Liability Defendants, the only form of prejudice to which the Liability Defendants specifically refer is the fact that the circuit court allocated two of the defense's eight total peremptory challenges to the Declaratory Defendants. In support of their argument, the Liability Defendants primarily rely on *Cawthon, supra.* In *Cawthon*, an automobile struck and killed the Cawthons' son while he was attempting to cross a three-lane highway to catch a school bus. Waco Fire and Casualty Insurance Co. (Waco) had issued an insurance policy to the board of education covering school bus accidents. While the Cawthons' wrongful death action was pending, Waco filed a declaratory action against the Cawthons and the board of education,

seeking a determination that the insurance policy did not cover the accident. Before trial, the Cawthons moved the trial court to realign the board of education as a plaintiff, i.e., a co-plaintiff with Waco. In particular, the Cawthons were concerned that they would otherwise be forced to share half of their "jury strikes," i.e., peremptory challenges, with the board of education, whose interests were clearly adverse to the Cawthons' interests. The trial court denied the motion to realign because "it had no authority to realign parties." *Id.* 386 S.E.2d at 33. However, the Georgia Supreme Court reversed, holding that the trial court did have "the discretion to realign the parties in the interest of justice." The *Cawthon* court noted "that multiple parties that are aligned on the same side of a case and have adverse interests are not entitled to additional peremptory strikes[.]" *Id.* Thus,

> if the trial court had exercised its discretion and denied the Cawthons' motion to realign, the denial would have been an abuse of discretion under the circumstances of this case. Those circumstances include the fact that the denial would have given (as did the court's failure to exercise its discretion) the Cawthons only three jury strikes, but would have given the parties asserting contrary legal and factual contentions nine jury strikes.

*Id.*

However, the instant case is distinguishable from *Cawthon* in that, unlike the co-parties in *Cawthon*, the Liability Defendants did not have to split half of the defense's eight total peremptory challenges with their co-defendants, the Declaratory Defendants. The circuit court allocated only two of the defense's eight peremptory challenges to the declaratory defendants, and, thus, the Liability Defendants retained the remaining six peremptory challenges for themselves. Meanwhile Kawamata Farms and the Tomono Plaintiffs shared a total of eight peremptory challenges. Therefore, the effect of the circuit court's denying the motions to realign in the instant case was much less severe for the Liability Defendants than it was for the co-parties in *Cawthon*. Al-

though the Liability Defendants had two less peremptory challenges than the Plaintiffs,

> [e]xact numerical equality between sides is not the purpose of equalization of peremptory challenges. Rather, the purpose is to equalize the positions of the parties to prevent one side, antagonistic among the parties on certain matters of fact with which they will be concerned, but primarily united in opposition to the other side, from selecting the jury.

*Diamond Shamrock Corp. v. Wendt,* 718 S.W.2d 766, 769 (Tex.Ct.App.1986) (citation omitted).

 Under HRS § 635–29(b) (1993), a circuit court is authorized to require co-parties to share peremptory challenges:

> § 635–29 Challenging peremptorily. . . .
>
> (b) In civil cases each party shall be allowed to challenge peremptorily three jurors, without assigning any reason therefor. *Where there are two or more plaintiffs or two or more defendants, they may be considered as a single party for the purposes of making peremptory challenges,* or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly. If additional peremptory challenges are allowed to the parties on one side, the opposing party or parties may be allowed additional peremptory challenges.
>
> . . . .

(Emphasis added). "The determination of whether the trial court erred in allocation [of peremptory challenges] is made at the time it makes its decision and not upon hindsight." *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 653 (Tex.Ct.App.1987) (citation omitted). Moreover,

> a judgment will not be reversed unless the error in awarding peremptory challenges to a litigant, or to multiple litigants having the same interest, is shown to be prejudicial. In order to prove the existence of prejudice, the complaining party must show that it exhausted his peremptory challenges and that a prospective juror, who the challenging party would have otherwise stricken, served on the jury.

*Carter v. Tom's Truck Repair, Inc.,* 857 S.W.2d 172, 177–78 (Mo.1993) (citations omitted).

The Liability Defendants have neither shown that they exhausted their peremptory challenges nor that a prospective juror, whom they would have otherwise challenged, served on the jury. Therefore, the Liability Defendants' argument, i.e., that the circuit court's denial of the motions for realignment adversely affected the number of peremptory challenges at their disposal, lacks merit.

Under these circumstances, the circuit court did not clearly exceed the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of the Liability Defendants by denying their motions to realign the parties. Therefore, the circuit court did not abuse its discretion, and we affirm the circuit court's orders denying these motions.

3. *The Circuit Court's Denial of the Liability Defendants' Motion for a Mistrial Following Plaintiffs' Counsel's Reference to a Verdict against DuPont in Another Case*

The Liability Defendants contend that the circuit court deprived the Liability Defendants of a fair trial by denying their motion for a mistrial after the Plaintiffs' counsel referred to a verdict from another case against DuPont. We disagree.

 "A motion for mistrial should be granted when there is an occurrence of such character and magnitude that a party is denied the right to a fair trial." *Aga v. Hundahl,* 78 Hawai'i 230, 245, 891 P.2d 1022, 1037 (1995). "Appellate review of a trial court's ruling on a motion for mistrial is under the abuse of discretion standard." *Id.*

During opening statements in the instant case, counsel for the Plaintiffs made the following reference to a verdict against DuPont in a Texas case, *Peterson Brothers, Inc. v. E.I. DuPont De Nemours and Co. and Greenlight Chemical Co.,* Case No. 91–CI–12100, 24th Judicial District Court of Bexar County, Texas (hereinafter *"Greenlight"*), involving Benlate:

[COUNSEL FOR PLAINTIFFS]: ... Du Pont—Du Pont had a case in the '80's in Texas involving an allegation that Benlate had the same kind of—gaseous something was coming off the DBU was coming off. We haven't put the whole memo up here. But this is the last page of the memo that talks about that litigation.

And in this case, where they actually went to court, and they had a verdict against them, this—

[COUNSEL FOR DUPONT]: Excuse me, Your Honor, that is highly improper, and [counsel for the Plaintiffs] knows that.

Following the objection, counsel for DuPont moved for a mistrial. After hearing the parties' arguments regarding the relevance of the verdict, the circuit court concluded that some issues in *Greenlight* were relevant to the instant case, and, thus, denied the motion for a mistrial.

The Liability Defendants argue that the circuit court erred by denying the motion for a mistrial because "[a] jury is likely to give a prior verdict against the same defendant more weight than it warrants. The admission of a prior verdict creates the possibility that the jury will defer to the earlier result and this will, effectively, decide a case on evidence not before it." *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir.1975). In response, the Plaintiffs assert that, even assuming, arguendo, that the circuit court erred by basing its denial of the motion on its conclusion that some issues in *Greenlight* were relevant to the instant case, such error was harmless, because the reference by the Plaintiffs' counsel was not an occurrence of such character and magnitude that it denied the Liability Defendants their right to a fair trial.

In support of their argument, the Plaintiffs cite to *Harned v. Dura Corp.*, 665 P.2d 5 (Alaska 1983), in which a plaintiff brought a products liability suit against the successor of an alleged manufacturer of a portable compressed air tank to recover for injuries that he sustained when the tank exploded. During opening statements at the trial, defense counsel made a reference to other verdicts from similar cases in which the manufacturer had prevailed. When the plaintiff subsequently attempted to introduce testimony that would have rebutted defense counsel's opening statement about the other verdicts, the trial court sustained defense counsel's objection that such rebuttal testimony was irrelevant, and, during closing arguments, the trial court additionally refused to allow the plaintiff to offer a rebuttal argument regarding the other verdicts. On appeal, the Alaska Supreme Court noted that "prior verdicts are not relevant in subsequent trials involving different parties and factual settings. It follows that it [wa]s improper for [defense] counsel to advert to the disposition of the same or similar cases during argument to the jury." *Id.* at 8. "The propriety of references to the disposition of prior cases must be distinguished from the propriety of references to the incidents which generated such litigation." *Id.* at 8 n. 8. Because defense counsel's reference to the other verdicts was improper, the plaintiff's proffered "testimony or argument should have been allowed under the doctrine of curative admissibility." *Id.* at 9 (internal quotation marks and footnote omitted). Nevertheless, the *Harned* court held that this error was harmless because "the exclusion of [the plaintiff]'s rebuttal evidence and argument [wa]s not sufficiently prejudicial to warrant reversal." *Id.* (citations omitted).

Our conclusion that the error was harmless rests on the fact that a week intervened between opening arguments and submission of the case to the jury for deliberation. During that period, the jury heard several days of testimony from numerous witnesses. Throughout this testimony, no further mention was made regarding prior litigation, nor was the questioned statement reiterated by [defense] counsel during closing argument. Of further significance is the fact that the jury was specifically instructed it was "to consider only the evidence in the case" and that "statements and arguments of Counsel are not evidence in this case." Thus we think it unlikely that the jury ignored all the testimony which was produced as well as the trial court's admonition, and reached its decision on the basis of an ambiguous remark made by [defense] counsel in his opening argument. Under these circumstances, we conclude that [the plaintiff] was not substantially

prejudiced by the exclusion of rebuttal evidence or argument he sought to make. Therefore, we hold that the superior court's ruling did not constitute prejudicial error.

*Id.* at 10 (original brackets omitted).

We agree with the *Harned* court that it is generally improper for counsel to refer to other verdicts during opening statements. The reference by the Plaintiffs' counsel to the *Greenlight* verdict was improper. Therefore, it was error for the circuit court to base its denial of the Liability Defendants' subsequent motion for a mistrial on its conclusion that some *issues* in *Greenlight* were relevant to the instant case. However, "[o]rdinarily a prevailing party's opening statement is not a ground for reversal unless the adversary's substantive rights have been prejudiced." *Lussier v. Mau–Van Development, Inc.*, 4 Haw.App. 359, 394, 667 P.2d 804, 827 (1983) (citations omitted). In order to warrant a mistrial, the improper reference to the *Greenlight* verdict had to constitute an occurrence of such character and magnitude that it denied the Liability Defendants their right to a fair trial. *Aga,* 78 Hawai'i at 245, 891 P.2d at 1037.

As in *Harned,* the improper reference by the Plaintiffs' counsel to the verdict in *Greenlight* was extremely brief during the Plaintiffs' opening statement. Furthermore, the Liability Defendants do not claim that the Plaintiffs' counsel subsequently made any further references to the verdict in *Greenlight* during the remainder of the seven-month trial, which was much longer in duration than the one week trial in *Harned.*

The Plaintiffs also note that the circuit court instructed the jury throughout trial that the statements of counsel were not evidence. As a rule, we presume that the jury followed the circuit court's instructions. *Knight,* 80 Hawai'i at 327, 909 P.2d at 1142; *Tawata,* 79 Hawai'i at 21, 897 P.2d at 948.

Therefore, in light of the brevity of the improper reference to the *Greenlight* verdict by the Plaintiffs' counsel during his opening argument, the seven-month duration of the trial, the circuit court's instructions to the jury, and the overwhelming evidence in the record supporting the jury's verdict, we hold that, although it was improper for the

Plaintiffs' counsel to refer to the verdict in *Greenlight* during opening statements, this reference did not constitute an occurrence of such character and magnitude that it denied the Liability Defendants their right to a fair trial. *Aga,* 78 Hawai'i at 245, 891 P.2d at 1037. Although we might not agree with all of the circuit court's reasoning in denying the Liability Defendants' motion for a mistrial, "where the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling." *Delos Reyes v. Kuboyama,* 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994) (citations omitted). Accordingly, we hold that the circuit court did not abuse its discretion by denying the Liability Defendants' motion for a mistrial.

In summary, although the circuit court made some errors in the trial, such errors were harmless and insubstantial. We hold that the circuit court did not deny the Liability Defendants their constitutional right to a fair trial by: (1) sanctioning one of the Liability Defendants, DuPont, for its discovery misconduct by instructing the jury that it could consider DuPont's discovery misconduct in deciding the merits of the case; (2) denying the Liability Defendants' motions to realign the parties; and (3) denying the Liability Defendants' motion for a mistrial after the Plaintiffs' counsel referred to the *Greenlight* verdict against DuPont.

### C. The Circuit Court's Discovery Sanctions against DuPont

The Liability Defendants contend that the circuit court reversibly erred by imposing the following discovery sanctions against DuPont: (1) a $1.5 million fine, payable to the State of Hawai'i; and (2) an order lifting previous protective orders regarding allegedly privileged documents. A "circuit court is given broad discretion in determining the sanctions to be imposed pursuant to [HRCP] Rule 37(b)(2)." *Wong,* 66 Haw. at 394, 665 P.2d at 161. Circuit courts also have broad discretion to sanction litigants pursuant to their "inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them." *Richardson,* 76 Hawai'i at 507, 880

P.2d at 182. A circuit "court's imposition of a discovery abuse sanction is reviewable on appeal for abuse of discretion." *Aloha Unlimited, Inc.*, 79 Hawai'i at 532–33, 904 P.2d at 546–47 (citation and internal quotation marks omitted). We review these two sanctions in turn.

### 1. *The $1.5 Million Sanction against DuPont*

The Liability Defendants' only allegation of error regarding the $1.5 million discovery sanction against DuPont is their contention, raised for the first time on appeal, that the circuit court violated DuPont's constitutional rights. The Liability Defendants claim that, because the circuit court made the $1.5 million sanction against DuPont payable to the State of Hawai'i, the fine constituted a criminal contempt sanction, and, thus, the circuit court should have provided DuPont with the criminal contempt procedural protections that are guaranteed under the United States Constitution, the Hawai'i Constitution, and HRS § 710–1077 (1993).

■■■■■ The record indicates that the Liability Defendants failed in the circuit court to raise the issue of whether the court was complying with criminal contempt procedural protections pursuant to the United States Constitution, the Hawai'i Constitution, and/or HRS § 710–1077. Although the Liability Defendants raised other objections to the $1.5 million sanction based on other specific grounds, "the making of an objection upon a specific ground is a waiver of all other objections." *State v. Matias*, 57 Haw. 96, 101, 550 P.2d 900, 904 (1976) (citation and internal quotation marks omitted). "The general rule is that an issue which was not raised in the lower court will not be considered on appeal." *Kernan v. Tanaka*, 75 Haw. 1, 35, 856 P.2d 1207, 1224 (1993) (citation and internal quotation marks omitted), *cert. denied*, 510 U.S. 1119, 114 S.Ct. 1070, 127 L.Ed.2d 389 (1994); *Mauna Kea Power Co., Inc. v. Board of Land and Natural Resources*, 76 Hawai'i 259, 262 n. 2, 874 P.2d 1084, 1087 n. 2 (1994); *Birmingham v. Fodor's Travel Publications, Inc.*, 73 Haw. 359, 371, 833 P.2d 70, 77 (1992); *State v. Ildefonso*, 72 Haw. 573, 584, 827 P.2d 648, 655 (1992); *State v. Hoglund*, 71 Haw. 147, 150–51, 785 P.2d 1311, 1313 (1990).

There are sound reasons for the rule. It is unfair to the trial court to reverse on a ground that no one even suggested might be error. It is unfair to the opposing party, who might have met the argument not made below. Finally, it does not comport with the concept of an orderly and efficient method of administration of justice.

*Ellis v. State*, 36 Ark.App. 219, 821 S.W.2d 56, 57 (1991).

Thus, for example, after a federal district court imposed a $125,000 contempt sanction against the City of Philadelphia (City) for the City's failure to comply with the district court's earlier order requiring the City to maintain a 90 percent occupancy rate in a residential drug treatment facility, the United States Court of Appeals for the Third Circuit rejected the City's constitutional argument, raised for the first time on appeal, that the district court violated due process by imposing "the contempt sanction without affording it adequate notice or hearing." *Harris v. City of Philadelphia*, 47 F.3d 1333, 1338 (3d Cir.1995).

The City raised no due process arguments in the district court, either at the June 11, 1993 hearing or in its motion for reconsideration. This court generally refuses to consider issues raised for the first time on appeal. The City has put forward no reason why we should disregard our strong policy in favor of allowing district courts to decide such issues in the first instance when there was no obstacle to their review in the district court, and thus the City's waiver of its due process argument is a sufficient basis to reject its contention.

*Id.* at 1339 (citations and internal quotation marks omitted).

■■■■■ Thus, when a party fails to raise an issue about the constitutionality of a contempt sanction before the trial court, the reviewing appellate courts may deem the constitutional issue waived. *See, e.g., In re Grand Jury Proceedings*, 875 F.2d 927, 932 (1st Cir.1989) ("[The appellant]'s failure to object in the district court deprived him of any right to raise these matters on appeal." (Citations omitted.)); *Yarbrough v. Yar-*

*brough,* 295 Ark. 211, 748 S.W.2d 123, 124 (1988) (rejecting an appellant's contention that his sentence constituted cruel and unusual punishment because he did not raise that issue before the trial court); *Ellis,* 821 S.W.2d at 57 (rejecting a defendant's argument that there was no notification of the contempt proceeding, because the defendant failed to present this argument to the trial court); *In re Smith,* 211 Ga.App. 493, 439 S.E.2d 725, 728 (1993) (holding that any defense involving the insufficiency of service of process on the appellant was clearly waived when he failed to raise this issue at the time of pleading); *McCarthy v. Iowa Dist. Court for Jefferson County,* 386 N.W.2d 122, 127 (1986) (holding that the issue of a plaintiff's self-incrimination could not be addressed on appeal because it was waived at the district court level); *Ex Parte Bowers,* 886 S.W.2d 346, 348 (Tex.Ct.App.1994) (rejecting a petitioner's contention that he never received notice of the motion for contempt, but only notice of the show of cause hearing, because this issue was never raised before the trial court, and, thus, it was waived).

The record indicates that, like some of the appellants in the above cases, DuPont had ample opportunity on multiple occasions to raise the issue before the circuit court of whether the circuit court, by issuing a $1.5 million sanction against DuPont, was complying with criminal contempt procedural protections pursuant to the United States Constitution, the Hawai'i Constitution, and/or HRS § 710–1077. However, at oral arguments and in their appellate briefs, the Liability Defendants failed to show that they raised this issue before the circuit court.

Because the Liability Defendants failed to raise the issue regarding the constitutionality of the $1.5 million sanction before the circuit court, we hold that the Liability Defendants have waived this alleged error. Therefore, we affirm the $1.5 million sanction against DuPont.

### 2. The Order Lifting Previous Protective Orders

The Liability Defendants contend that the circuit court abused its discretion in sanctioning DuPont by ordering that protective orders concerning the confidentiality of DuPont documents be lifted with the exception of those documents which contained trade secrets. We disagree.

We have utilized the following three factors in determining whether a discovery sanction was appropriate: (1) the offending party's culpability, if any, in destroying or withholding discoverable evidence that an opposing party had formally requested through discovery; (2) whether the opposing party suffered any resulting prejudice as a result of the offending party's destroying or withholding the discoverable evidence; and (3) the inequity that would occur in allowing the offending party to accrue a benefit from its conduct. *Richardson,* 76 Hawai'i at 507, 880 P.2d at 182. Applying these three factors to the instant case, we note that: (1) the circuit court specifically found that DuPont had intentionally withheld numerous documents in blatant violation of previous court orders compelling discovery of those documents, and, thus, DuPont was culpable in withholding the documents; (2) because the documents could be interpreted as demonstrating liability on the part of the Liability Defendants, DuPont's withholding these documents prejudiced the Plaintiffs; and (3) it would have been inequitable for DuPont to benefit from its own discovery misconduct and the Plaintiffs' inability to acquire possession of the inculpating documents prior to the commencement of trial. DuPont theoretically could have prevailed against the Plaintiffs as a direct result of its pattern of discovery abuse, which is a result that we will not tolerate in the courts of Hawai'i. Based on the three factors that we utilized in *Richardson,* DuPont clearly deserved severe discovery sanctions, including the order lifting protective orders concerning the confidentiality of DuPont documents.

The Liability Defendants cite *Richards v. Superior Court for Los Angeles County,* 86 Cal.App.3d 265, 150 Cal.Rptr. 77 (1978), in which a California Court of Appeal held that a trial court abused its discretion by dissolving an existing protective order as a sanction for a party's failure to supply a sufficiently detailed statement in response to a discovery request.

While the trial judge is vested with discretion to impose sanctions for failure of com-

pliance with discovery orders, the sanction imposed must be appropriate to the dereliction, must be authorized by the discovery statutes, and must not exceed that which is necessary to protect the interests of the party entitled to but denied discovery.

*Id.* 150 Cal.Rptr. at 79 (citation omitted). The *Richards* court held that, under the circumstances of that particular case, a "court may not deny [a party] the protection of [a protective] order as a sanction for failure to comply with the mandates of the discovery statutes." *Id.* at 78.

However, the circumstances in *Richards* are distinguishable from the instant case. While the protective orders in the instant case applied to information and documents that the Plaintiffs had sought primarily for the purpose of the adjudication of their substantive claims against the Liability Defendants, the protective orders in *Richards* applied only to information and documents regarding the financial status of defendants that the plaintiffs in *Richards* had sought for the purpose of helping the trial court determine punitive damages. Thus, the *Richards* court granted the defendants' petition for writ of mandamus under the following rationale:

> Discovery seeking *financial information* by reason of a claim for *punitive damages* is one classic instance of the manner in which civil discovery is used to achieve a litigation advantage never contemplated when the methodology was introduced into pretrial procedure. Causes of action for *punitive damages* have become very easy to allege. Response to discovery seeking *financial information* places a severe burden on the responder. As a minimum, there is the time and expense necessary to the compilation of a complex mass of *information unrelated to the substantive claim involved in the lawsuit and relevant only to the subject matter of a measure of damages* which may never be awarded. In addition, there is usually the potential that untoward disclosure of the information obtained may in some way or other react adversely against the disclosing party for reasons totally unrelated to the lawsuit. The possibilities run all the way from greater exposure to the not so gentle solicitations of some charitable organizations to the possibility of damage to the discloser in the competitive business arena.

> . . . .

> Given the presently broad test of discoverable matter, the burden incident to the compilation of information that may never be of value to any one seems built into the process. The potential of untoward disclosure of the *financial information* obtained in the discovery process is not. It seems a rare instance indeed that the potential of disclosure for purposes unrelated to the lawsuit or to persons other than counsel and their representatives serves any purpose except to give a tactical edge to the party who has obtained discovery of the information by allowing that party the benefit of pressure in settlement negotiations by threat or implication of disclosure.

> We hence conclude that where a party is compelled in civil discovery to reveal *financial information* because the information is relevant to the subject matter of a claim for *punitive damages,* that party is, upon his motion, presumptively entitled to a protective order that the information need be revealed only to counsel for the discovering party or to counsel's representative, and that once so revealed, the information may be used only for the purposes of the lawsuit. The burden is upon the opposing party to establish a substantial reason why the order should be denied. That reason must be related to the lawsuit.

*Id.* at 80–81 (emphases added) (citations omitted).

As stated, the protective orders in the instant case were not the result of a limited attempt to discover information about Du-Pont's financial status for the narrow purpose of determining punitive damages. The protective orders in the instant case related to discoverable information and documents that were directly relevant to the Plaintiffs' efforts to prove their substantive claims for compensatory damages against the Liability Defendants.

More importantly, DuPont's dereliction in the instant case was much more extreme than the dereliction in *Richards.* The record shows that DuPont engaged in a pattern of

discovery abuse by, among other things, violating the circuit court's discovery orders, "dumping" forty boxes of documents pursuant to one of the Plaintiffs' interrogatory requests, and intentionally withholding information and documents that DuPont should have produced during discovery. This inexcusable behavior by DuPont is very disturbing.

Accordingly, we hold that the circuit court did not abuse its discretion in sanctioning DuPont by ordering that protective orders concerning the confidentiality of DuPont documents be lifted with the exception of those documents that contained trade secrets.

D. *The Circuit Court's Denial of DuPont's and Bartlo Packaging, Inc.'s Motion for a New Trial Based on the Allegation that the Plaintiffs Had Concealed Two Experts*

The Liability Defendants contend that the circuit court erred by denying DuPont and Bartlo Packaging, Inc.'s (Bartlo) motion for a new trial in light of their allegation that the Plaintiffs concealed two experts throughout the litigation. We disagree. "Both the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion." *United States Steel Corp.*, 82 Hawai'i at 54, 919 P.2d at 316 (citations and internal quotation marks omitted).

DuPont and Bartlo moved for a new trial based on both newly discovered evidence and the alleged fraud, misrepresentation, or misconduct of the Plaintiffs. Other Liability Defendants joined their motion. The Liability Defendants asserted that the Plaintiffs had concealed the involvement of two expert scientists, Dr. Harry K. Tayama and Dr. David S. Koranski, throughout the trial by having failed to (1) identify either scientist in response to the Liability Defendants' pretrial discovery requests and (2) assert any privilege in doing so. Drs. Tayama and Koranski had investigated the damage to the Plaintiffs' plants and had studied, among other things, the phototoxicity of Benlate on plants. The circuit court denied the motion for a new trial, and, on appeal, the Liability Defendants claim that the circuit court erroneously based its denial on the standard for a new trial

under *Orso v. City and County of Honolulu*, 56 Haw. 241, 534 P.2d 489, (1975), which applies to a motion for a new trial pursuant to HRCP Rule 60(b)(2) based on "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)[.]" HRCP Rule 60(b)(2).

The authorities are in agreement that a new trial based on newly discovered evidence can be granted provided the evidence meet the following requirements: (1) it must be previously undiscovered even though due diligence was exercised; (2) it must be admissible and credible; (3) it must be of such a material and controlling nature as will probably change the outcome and not merely cumulative or tending only to impeach or contradict a witness.

*Id.* at 250, 534 P.2d at 494 (citations omitted). While the *Orso* standard governed the Liability Defendants' motion for a new trial to the extent that they were asserting it pursuant to HRCP Rule 60(b)(2), the Liability Defendants note that they also brought their motion for a new trial pursuant to HRCP Rule 60(b)(3), under which a court may relieve a party from a final judgment procured through the "fraud ..., misrepresentation, or other misconduct of an adverse party." HRCP Rule 60(b)(3). According to the Liability Defendants, by basing its denial of the motion for a new trial on the *Orso* standard, the circuit court failed to apply the proper standard for the Liability Defendants' motion to the extent that they asserted it pursuant to HRCP Rule 60(b)(3).

However, "where the circuit court's decision is correct, its conclusion will not be disturbed on the ground that it gave the wrong reason for its ruling." *Delos Reyes*, 76 Hawai'i at 140, 870 P.2d at 1284 (citations omitted). Applying the circuit court's findings of fact to the standard for HRCP Rule 60(b)(3), we conclude that the circuit court's decision was correct.

HRCP Rule 60(b)(3) is essentially identical to Federal Rule of Civil Procedure (FRCP) Rule 60(b)(3). Where we have patterned a rule of procedure after an equivalent rule within the FRCP, interpretations

of the rule "by the federal courts are deemed to be highly persuasive in the reasoning of this court." *Harada v. Burns*, 50 Haw. 528, 532, 445 P.2d 376, 380 (1968) (footnote omitted). According to the United States Court of Appeals for the Ninth Circuit, "[u]nder [FRCP] Rule 60(b)(3), the movant must, (1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct[, and] (2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense." *Jones v. Aero/Chem Corp.*, 921 F.2d 875, 878–79 (9th Cir.1990) (citation and internal quotation marks omitted); *Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1338 (9th Cir.1986); *Bunch v. United States*, 680 F.2d 1271, 1283 (9th Cir. 1982). Based on the circuit court's findings of fact, the Liability Defendants failed to satisfy this two prong test.

■ We initially note that the Liability Defendants' argument with the circuit court's conclusion does not take issue with the circuit court's supporting findings of fact. "If a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid." *Wisdom v. Pflueger*, 4 Haw.App. 455, 459, 667 P.2d 844, 848 (1983). Although the Liability Defendants designated the circuit court's denial of their motion as a point of error in the section of their opening brief entitled "Statement of Points on Appeal," they neither quoted the circuit court's supporting findings of fact nor included a statement explaining why the findings of fact were allegedly erroneous. Under HRAP Rule 28(b)(4)(C), "[w]hen the point involves findings ... of the court below, those urged as error shall be quoted in their entirety and there shall be included a statement explaining why the findings of fact ... are alleged to be erroneous." "Points not presented in accordance with this section will be disregarded, except that the court, at its option, may notice a plain error not presented." HRAP Rule 28(b)(4)(D). Because the Liability Defendants have failed to comply with HRAP Rule 28(b)(4)(C), they have waived any challenge regarding the findings of fact that support the circuit court's denial of their motion for a new trial, and, thus, the unchallenged findings of fact

are binding upon the Liability Defendants. *Doe v. Roe*, 5 Haw.App. 558, 568, 705 P.2d 535, 545 (1985); *Burgess v. Arita*, 5 Haw. App. 581, 593, 704 P.2d 930, 939 (1985).

Among the unchallenged findings of fact, the circuit court specifically found that the Liability Defendants failed to support its allegations that the Plaintiffs committed fraud when the Plaintiffs identified Drs. Koranski and Tayama as consultants to prepare for trial instead of as experts who would testify at trial. The circuit court found that it had not ordered the Plaintiffs to disclose the identities of Drs. Koranski and Tayama or their work product. In pretrial discovery hearings, the Plaintiffs properly claimed the attorney work product privilege regarding their consultants' identities and work product pursuant to HRCP Rule 26(b). The Plaintiffs also appropriately preserved the attorney work product privilege regarding their consultants in their answers to the Liability Defendants' interrogatories. With regard to the Liability Defendants' allegations that the Plaintiffs failed to properly provide Benlate samples to the Liability Defendants for testing, the circuit court found that the Plaintiffs' production of their Benlate samples to the Liability Defendants was proper and gave the Liability Defendants an adequate opportunity: (1) to obtain Benlate samples from the Plaintiffs; and (2) to perform appropriate tests on the samples for presentation at trial. Based on these findings, the circuit court concluded that the Liability Defendants' allegation of fraud on the part of the Plaintiffs was without merit. Thus, the record shows that the Liability Defendants failed to satisfy the first requirement under the HRCP Rule 60(b)(3) standard, i.e., that the movant prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct. *Jones*, 921 F.2d at 878–79.

The Liability Defendants also failed to satisfy the second requirement of the HRCP Rule 60(b)(3) standard, i.e., that the movant establish that the conduct complained of prevented the losing party from fully and fairly presenting its case or defense. *Jones*, 921 F.2d at 879. The circuit court specifically found that, even if it had ordered the disclosure of Drs. Koranski and Tayama's information, their testimony would not have been

material and controlling, and probably would not have changed the outcome of the seven-month trial in light of numerous defense witnesses' testimony on the same issues. In addition, the circuit court found that the opinions of Drs. Tayama and Koranski about the phototoxicity of Benlate on plants appeared to be favorable to the Plaintiffs' case rather than the Liability Defendants' case. Thus, the conduct complained of did not prevent the Liability Defendants from fully and fairly presenting their case or defense.

The unchallenged findings of fact show that the Liability Defendants failed to satisfy the standard for a new trial under HRCP Rule 60(b)(3). Because the circuit court's unchallenged findings of fact were binding on the Liability Defendants in this appeal and supported the circuit court's conclusion to deny the motion for a new trial, the circuit court did not clearly exceed the bounds of reason or disregard rules or principles of law or practice to the substantial detriment of the Liability Defendants. Therefore, the circuit court did not abuse its discretion, and, accordingly, we affirm its order denying the Liability Defendants' motion for a new trial pursuant to HRCP Rule 60(b)(3).

E. *The Circuit Court's Denial of the Liability Defendants' Post–Trial Motion for Judgment Notwithstanding the Verdict Regarding the Plaintiffs' Tort Claims Based on the Economic Loss Doctrine*

 The Liability Defendants contend that the circuit court erred by denying their post-trial motion for judgment notwithstanding the verdict regarding the Plaintiffs' tort claims under the economic loss doctrine. We disagree.

It is well settled that denials of directed verdict or judgment notwithstanding the verdict (JNOV) motions are reviewed de novo. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined "substantial evidence" as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.

*Takayama v. Kaiser Foundation Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation, some internal quotation marks, and original brackets omitted).

In the instant case, the Liability Defendants filed a post-trial motion for judgment notwithstanding the verdict, asserting that, because the jury concluded that the Plaintiffs' injuries were a result of "economic loss," rather than damage to the soil or farm structures, the economic loss doctrine precluded Plaintiffs from any recovery in tort as a matter of law. The circuit court denied the motion, concluding, among other things, that "[t]he majority of Plaintiffs' compensatory damages awarded by the jury were for plant replacement costs for the damages to Plaintiffs' plant inventory [that] constitutes 'other property,' which therefore brings this case out of the realm of the economic loss doctrine."

 The Liability Defendants correctly state that "the economic loss rule applies to bar recovery of pure economic loss in actions based on products liability." *United States Steel Corp.*, 82 Hawai'i at 45, 919 P.2d at 307 (holding, however, that, even where damages were purely economic, the economic loss doctrine did not preclude a cause of action based on negligent misrepresentation, because such a claim did not sound in products liability). In *United States Steel Corp.*, we summarized a leading case, *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), in pertinent part as follows:

In *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), the United States Supreme Court acknowledged the "economic loss" rule, effectively adopted the rationale of the California Supreme Court in *Seely v. White Motor Co.*, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), and held that *no products liability claim lies in admiralty when a commercial purchaser alleges injury only to the*

*product itself, resulting in purely economic loss.* In *East River,* a shipbuilder contracted with Transamerica to design, manufacture, and supervise the installation of turbines that would be the main propulsion ·units for four oil-transporting supertankers constructed by the shipbuilder. After each ship was completed, it was chartered to one of the petitioners. When the ships were put into service, the turbines on all four ships malfunctioned due to design and manufacturing defects. *Only the products themselves were damaged.* The petitioners filed suit against Transamerica, alleging causes of action sounding in products liability, seeking damages for the cost of repairing the ships and for income lost while the ships were out of service. The district court granted summary judgment in favor of Transamerica, and the court of appeals affirmed, holding that the petitioner's dissatisfaction with product quality did not state a claim cognizable in tort.

The United States Supreme Court affirmed the circuit court, holding that *a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself.*

*United States Steel Corp.* 82 Hawai'i at 39, 919 P.2d at 301 (emphases added).

■ However, the instant case is distinguishable from *East River,* because, in *East River,* only the defective products themselves suffered injury. In contrast, the Plaintiffs in the instant case did not claim that the defective product, Benlate, suffered injury, but, rather, that the defective Benlate injured their farm crops, i.e., the Plaintiffs' "other property."

■ In a similar case involving DuPont, a Florida District Court of Appeals held that where DuPont's "product Benlate[ ] caused damage to the tomato crop, ... the [economic loss doctrine] is not applicable." *E.I. DuPont De Nemours v. Finks Farms,* 656 So.2d 171, 172 (Fla.Dist.Ct.App.1995). Like the Plaintiffs in the instant case, the plaintiff in *Finks Farms* was a farmer who had suffered damage to its tomato crop as a result of having applied defective Benlate, and, as a result, the plaintiff sued DuPont on the basis of strict and negligent product liability, claiming that there was "a manufacturing or design defect in Benlate and that the defect was the proximate cause of damage to its ... crop." *Id.* at 172. After the plaintiff won a $693,917.21 judgment, DuPont appealed, contending that the economic loss doctrine barred the plaintiff's recovery for its purely economic loss. DuPont apparently argued that the tomato plants were the finished product, rather than the Benlate that the plaintiff had earlier applied to the tomato plants. Therefore, according to DuPont, the tomato plants were not "other property." However, the *Finks Farms* court disagreed with DuPont, explaining as follows:

> [T]he [plaintiff] in the instant case bargained for *Benlate* as a finished product, and *the finished product,* not just a component of it, *damaged other property.* The *other property consisted of the tomato plants* and/or the land upon which the Benlate was sprayed....
>
> . . . .
>
> ... [C]ontract principles are more appropriate than tort principles for recovering economic loss where there is no accompanying physical injury or property damage to other property. *Where, however, as in the instant case, the finished product causes property damage to other property, the economic loss doctrine does not apply.* The [plaintiff], therefore, was properly allowed to recover its damages in tort.

*Id.* at 172–73 (emphases added).

Likewise in the instant case, the Plaintiffs bargained for Benlate as the finished product, and this finished product damaged "other property" consisting of the Plaintiffs' crops upon which Benlate was applied. Where the finished product caused damage to other property, the economic loss doctrine does not apply, and, thus, the economic loss doctrine did not bar the Plaintiffs from recovering damages for their crop damage. Accordingly, the circuit court was correct, and we affirm its order denying the Liability Defendants' post-verdict motion for judgment notwithstanding the verdict.

F. *The Plaintiffs' and Declaratory Defendants' Relief from Judgment Pursuant to HRCP Rule 60(b)(3)*

After judgment was entered and the notice of appeal was filed in this case, the Plaintiffs

and Declaratory Defendants learned about additional discovery fraud and misconduct on the part of DuPont and, as a result, they moved for relief from judgment and additional sanctions against DuPont pursuant to HRCP Rule 60(b)(3). Because the Liability Defendants' appeal before this court was already pending, the Plaintiffs moved for remand to allow the circuit court to enter its findings of fact, conclusions of law, and order regarding the Plaintiffs' and Declaratory Defendants' motion for HRCP Rule 60(b)(3) relief. We granted the Plaintiffs' motion to remand on August 19, 1996 and informed the parties that they could submit ten-page briefs limited to the propriety of the relief pursuant to the HRCP Rule 60(b)(3) motion. On August 22, 1996, the circuit court entered findings of fact, conclusions of law, and an order regarding the Plaintiffs' and Declaratory Defendants' motions for HRCP Rule 60(b)(3) relief and for sanctions against DuPont. On appeal, the Liability Defendants contend, because the Plaintiffs were the prevailing parties, that they were not entitled to affirmative relief from the judgment pursuant to HRCP Rule 60(b)(3) and, furthermore, that any newly discovered misconduct on the part of DuPont did not prevent the Plaintiffs and Declaratory Defendants from fully and fairly presenting their case and/or defense. We disagree.

HRCP Rule 60(b)(3) provides in relevant part:

> ## Rule 60. RELIEF FROM JUDGMENT OR ORDER.
>
> . . . .
>
> **(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, Etc.** On motion and upon such terms as are just, *the court may relieve a party or his legal representative from a final judgment, order, or proceeding* for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party.

(Emphasis added).

■■ "When interpreting rules promulgated by the court, principles of statutory

construction apply." *State v. Baron,* 80 Hawai'i 107, 113, 905 P.2d 613, 619 (1995) (citation and internal quotation marks omitted).

> The standard of review for statutory construction is well-established. The interpretation of a statute is a question of law which this court reviews de novo. In addition, our foremost obligation is to ascertain and give effect to the intention of the legislature[,] which is to be obtained primarily from the language contained in the statute itself. And where the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning.

*State v. Wells,* 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995) (citations and internal quotation marks omitted).

There is no Hawai'i case authority dealing with a HRCP Rule 60(b)(3) motion based on fraud, misrepresentation, or misconduct related to discovery; however, Rule HRCP 60(b)(3) is essentially identical to FRCP Rule 60(b)(3), and where we have patterned a rule within the HRCP after an equivalent rule within the FRCP, interpretations of the rule "by the federal courts are deemed to be highly persuasive in the reasoning of this court." *Harada,* 50 Haw. at 532, 445 P.2d at 380 (1968) (footnote omitted).

In order to obtain relief from judgment "[u]nder [FRCP] Rule 60(b)(3), the movant must[ ] (1) prove by clear and convincing evidence that the verdict was obtained through fraud, misrepresentation, or other misconduct, [and] (2) establish that the conduct complained of prevented the losing party from fully and fairly presenting his case or defense." *Jones,* 921 F.2d at 878–79 (citation and internal quotation marks omitted); *Lafarge Conseils et Etudes, S.A.,* 791 F.2d at 1338; *Bunch,* 680 F.2d at 1283. Based on the circuit court's findings of fact, the Plaintiffs and Declaratory Defendants failed to satisfy the *Jones* two-prong test for relief from judgment.[7]

---

7. The circuit court stated in conclusions of law 17, 22, 27, and 30 that specific representations by DuPont to the circuit court, regarding DuPont's production of the Alta *Bush Ranch* documents and whether these documents were privileged under the attorney work product doctrine, were fraudulent by clear and convincing evi-

Additionally, according to federal courts, relief under FRCP Rule 60(b)(3), the federal equivalent of HRCP Rule 60(b)(3), "is available only to set aside a prior order or judgment; a court may not use Rule 60 to grant affirmative relief in addition to the relief contained in the prior order or judgment." 12 J. Moore, *Moore's Federal Practice* § 60.25 (3d ed.1997) (footnote omitted); *United States v. One 1961 Red Chevrolet Impala Sedan, Serial No. 11837A177369*, 457 F.2d 1353, 1355 (5th Cir.1972) ("[T]he only relief that [can] be granted under Rule 60(b) [i]s the setting aside of the judgment."); *Adduono v. World Hockey Ass'n*, 824 F.2d 617, 620 (8th Cir.1987) ("Rule 60(b) is available ... only to set aside a prior order or judgment. It cannot be used to impose additional affirmative relief."); *United States v. One Hundred Nineteen Thousand Nine Hundred Eighty Dollars ($119,980.00)*, 680 F.2d 106, 107 (11th Cir.1982) ("Rule 60(b) is available ... only to set aside the prior order or judgment. It cannot be used to impose additional relief."). Under the interpretation of the federal courts, pursuant to HRCP Rule 60(b)(3), we could not grant affirmative relief to the Plaintiffs in the form of additional attorneys' fees and costs, but could only set aside the circuit court's HRCP Rule 60(b)(3) order.

■ However, notwithstanding their persuasiveness, interpretations of the FRCP by federal courts are by no means conclusive with respect to our interpretation of any rule within the HRCP. "Article VI, section 7 of the Hawai'i Constitution provides that the supreme court shall have power to promulgate rules and regulations in all civil and criminal cases for all courts relating to process, practice, procedure and appeals, which shall have the force and effect of law." *Price v. Obayashi Hawaii Corp.*, 81 Hawai'i 171, 177, 914 P.2d 1364, 1370 (1996) (internal quotation marks and original brackets omitted).

It is well settled that the trial court has a very large measure of discretion in passing upon motions under Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b) and its order will not be set aside unless we are persuaded that under the circumstances of the particular case, the court's refusal to set aside its order was an abuse of discretion. *Hawai'i Hous. Auth. v. Uyehara*, 77 Hawai'i 144, 147, 883 P.2d 65, 68 (1994) (citations, internal quotations marks and original brackets omitted). As the promulgator of the HRCP and the court of last resort in Hawai'i, we are the ultimate interpreter of HRCP Rule 60(b)(3) as long as our interpretation of HRCP Rule 60(b)(3) does not offend the United States Constitution.

■ The record shows that DuPont committed discovery fraud upon the circuit court and the other parties. Fraud upon the court "is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944). A "trial court has a duty and a right to determine that its judgments are correct and accurately reflect the truth." *Potter v. Eli Lilly and Co.*, 926 S.W.2d 449, 453 (Ky.1996). "The highest verity, from considerations of public policy, is attributed to the records and judgments of courts as matters of evidence and they ought to be most carefully preserved and authenticated." *Id.* (citation and inter-

---

dence. Although we have no reason to doubt this extremely disturbing finding, the Plaintiffs and Declaratory Defendants obviously could not prove by clear and convincing evidence that the Liability Defendants, as the losing parties, obtained a verdict through DuPont's discovery fraud, misrepresentation, and misconduct because the verdict was in favor of the Plaintiffs and against the Liability Defendants. Although the Liability Defendants obtained a favorable verdict as to the Declaratory Defendants' cross-claims against them, the circuit court stated in finding of fact 97 that the Declaratory Defendants' cross-claim against DuPont was not ad-

versely affected by DuPont's discovery misconduct. Thus the Plaintiffs and the Declaratory Defendants failed to satisfy the first requirement under the *Jones* test for relief from judgment.

In addition, because the Plaintiffs won a favorable verdict, and because DuPont's discovery misconduct did not adversely affect the Declaratory Defendants, the Plaintiffs and Declaratory Defendants also failed to satisfy the second requirement under the *Jones* standard for relief from judgment by having failed to establish that DuPont's discovery misconduct prevented a losing party from fully and fairly presenting their case or defense.

nal quotation marks omitted). "The judgment is the last word of the law in any judicial controversy." *Id.* (citations omitted). Therefore, "[f]raud, misrepresentation, and circumvention used to obtain a judgment are generally regarded as sufficient cause for the opening or vacating of the judgment." *Southwest Slopes, Inc. v. Lum,* 81 Hawai'i 501, 511, 918 P.2d 1157, 1167 (App.1996) (citation, internal quotation marks, and original brackets omitted).

■ In this case, considering the egregious nature of the fraud by DuPont, we construe the HRCP so as not to disallow a remedy under HRCP Rule 60(b)(3) when there is a post-judgment discovery of fraud supported by clear and convincing evidence. *This interpretation of HRCP Rule 60(b)(3) departs from federal case law and sets a new precedent.* However, the instant case presents an unusual, unique example of unprecedented discovery fraud perpetuated against the court. As a matter of equity, it would be unfair to allow DuPont to escape accountability for its fraud, misrepresentation, and misconduct, simply by virtue of the fact that the Plaintiffs had the good fortune to somehow overcome DuPont's discovery fraud and obtain a favorable jury verdict.

Applying our interpretation of HRCP Rule 60(b)(3) to the present case, we must examine the circuit court's HRCP Rule 60(b)(3) order. As a result of DuPont's actions, the circuit court's HRCP Rule 60(b)(3) order: (1) sanctioned DuPont by awarding the Plaintiffs and the Declaratory Defendants additional attorneys' fees and costs incurred throughout the pretrial, trial, and post-trial proceedings relating to the misconduct that had not been previously been awarded as sanctions; (2) reaffirmed its prior punitive sanctions order and the $1.5 million sanction; and (3) amended its earlier findings of fact and conclusions of law (a) to accurately reflect the newly discovered examples of DuPont's discovery fraud and (b) to state how the circuit court would have ruled if the circuit court had known of DuPont's misconduct at the time the orders were issued (for example, the circuit court stated that it would have entered a default judgment against DuPont but did not).

■ With respect to the circuit court's sanctions involving attorneys' fees and costs, it is well-settled that courts have inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them. Inherent powers of the court are derived from the state Constitution and are not confined by or dependent on statute. The *courts* also *have inherent power* to curb abuses and promote a fair process, including the power *to impose sanctions in the form of attorneys' fees for abusive litigation practices.*

... Sanctions in the form of attorneys' fees and costs may be imposed by the trial court in accordance with Hawai'i Revised Statutes (HRS) 603–21.9(1) and (6) (1985), which is a legislative restatement of the inherent powers doctrine. Moreover, ... the inherent power of a court also can be invoked even if procedural rules exist which sanction the same conduct.

. . . .

Although it is well-settled that an appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance, we believe that, in order to facilitate a meaningful and more efficient appellate review, *an order imposing sanctions should set forth findings that describe, with reasonable specificity, the perceived misconduct (such as harassment or bad faith conduct), as well as the appropriate sanctioning authority* (*e.g.,* HRCP Rule 11 or the court's inherent power). For purposes of appellate review, a distinction must be made between zealous advocacy and plain pettifoggery.

Whether sanctions are imposed pursuant to [a specific rule of procedure, such as] HRCP Rule 11[,] or pursuant to the court's inherent powers, the importance of specific findings that describe the perceived misconduct and the sanctioning authority is two-fold. First, as previously noted, it allows for more meaningful appellate review as to whether the trial court exercised its discretion in a reasoned and principled fashion. Second, it assures the litigants, and incidentally the judge as well, that the decision was the product of thoughtful de-

liberation, and ... their publication enhances the deterrent effect of the ruling. *Enos v. Pacific Transfer & Warehouse, Inc.,* 79 Hawai'i 452, 457–59, 903 P.2d 1273, 1278–80 (1995) (citations, internal quotation marks, original brackets, and footnote omitted).

The circuit court's findings of fact and conclusions of law described with reasonable specificity the perceived misconduct, as well as the appropriate sanctioning authority. Among the many examples of misconduct, DuPont represented to the circuit court that it had previously asserted the work product privilege with respect to the Alta *Bush Ranch* documents in other Benlate-related cases. However, the circuit court subsequently discovered that this was not true. In conclusions of law 17, 22, 27, and 30, the circuit court stated that specific representations by DuPont to the circuit court regarding DuPont's production of the Alta *Bush Ranch* documents, as well as whether these documents were privileged under the work product doctrine, "were *fraudulent* by clear and convincing evidence." (Emphasis added). In conclusions of law 39 and 40, the circuit court also specifically noted that DuPont's misconduct was in bad faith and that the circuit court had inherent authority to sanction DuPont by imposing attorneys' fees and costs:

> 39. This Court finds that *Du Pont's conduct* as set forth herein constitutes *abusive litigation practices* and specifically finds that such practices were done in *bad faith*. This Court may properly assess attorneys' fees under its inherent authority under HRS § 603–21.9(1) and (6) (1985).
>
> 40. This Court concludes that *Du Pont's conduct* set forth in the Findings of Fact herein demonstrates that *Du Pont engaged in fraud and intentional misconduct which abused the judicial process. Du Pont acted in bad faith,* wantonly and for oppressive reasons and, therefore, *this Court has inherent authority to levy sanctions, award attorneys fees and costs,* and correct judgments and orders.

(Emphases added.)

Because we have interpreted HRCP 60(b)(3) to allow for affirmative relief in this case, and because attorneys' fees and costs were allowed by statute, we affirm the circuit court's sanctions of DuPont and its award of attorneys' fees and costs to Plaintiffs and the Declaratory Defendants.

With respect to the circuit court's reaffirmance of the $1.5 million fine, the circuit court did not increase this fine, but rather, merely reaffirmed it. Therefore, with respect to the $1.5 million fine, the circuit court did not provide any affirmative relief pursuant to HRCP Rule 60(b)(3).

▮▮▮▮ With respect to the circuit court's affirmative relief under HRCP Rule 60(b)(3) in the form of amended findings of fact reflecting the extent of DuPont's discovery fraud and misconduct, we have held that "a correction of the record of a judgment, and a *nunc pro tunc* entry thereof, may not be made to enlarge the judgment as originally rendered, ... or to show what the court might or should have decided, or intended to decide, as distinguished from what it actually did decide." *DuPonte v. DuPonte,* 53 Haw. 123, 127, 488 P.2d 537, 541 (1971). However, the instant case is distinguishable from *DuPonte* because it involves a circuit court's finding supported by clear and convincing evidence that a party made fraudulent representations to opposing parties and to the circuit court. In light of the strong public policy against litigants committing fraud within the courts, we hold, based on the egregious nature of the fraud by DuPont in this case, that the circuit court did not abuse its discretion when it granted the Plaintiffs and the Declaratory Defendants affirmative relief under HRCP Rule 60(b)(3) in the form of amended findings of fact and conclusions of law.

Furthermore, the Liability Defendants waived this particular issue when they failed to argue it in their Joint Supplemental Brief.

The Liability Defendants asserted that it was "beyond the scope of t[heir] 10–page supplemental brief (expressly limited to the propriety of the relief granted below ...) to address the underlying merits of the trial court's 60–page sanctions order." Liability Defendants' Joint Supplemental Brief at 10 n. 10. However, this statement by the Liability Defendants is not correct. When we granted the Plaintiffs' motion for remand on August 19, 1996, we specifically informed the parties that the Liability Defendants and the Plaintiffs could each submit a ten-page brief

"limited to the propriety of the relief granted pursuant to HRCP Rule 60(b) motion." Order in Case No. 19201, filed August 19, 1996, at 3. The so-called "60–page sanctions order" by the circuit court was part of the relief granted pursuant to HRCP Rule 60(b), and, thus, according to the plain meaning of our remand order, we gave the Liability Defendants an opportunity to address the underlying merits of the circuit court's findings of fact, conclusions of law, and order regarding HRCP Rule 60(b) relief and sanctions against DuPont. The Liability Defendants failed to argue the underlying merits of the circuit court's findings of fact, conclusions of law, and order regarding HRCP Rule 60(b) relief sanctions against DuPont and, therefore, the Liability Defendants waived any and all possible errors with respect to the underlying merits.[8]

Under the circumstances of this case, based on the egregious nature of DuPont's fraud, we construe the HRCP so as not to disallow a remedy under HRCP Rule 60(b)(3) when there is a post-judgment discovery of fraud supported by clear and convincing evidence. Accordingly, we affirm the circuit court's findings of fact, conclusions of law, and order, filed August 22, 1996, regarding the Plaintiffs' and Declaratory Defendants motions for HRCP Rule 60(b)(3) relief and sanctions against DuPont.

G. *The Circuit Court's Denial of the Declaratory Defendants' Motion for a New Trial*

In their cross-appeal, the Declaratory Defendants contend that the circuit court abused its discretion by denying their motion for a new trial pursuant to HRCP Rule 59(a) in light of newly discovered evidence of DuPont's discovery fraud and misconduct. We disagree.

HRCP Rule 59(a) provides that

[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the State[.]

Furthermore, "[b]oth the grant and the denial of a motion for new trial is within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion." *United States Steel Corp.*, 82 Hawai'i at 54, 919 P.2d at 316 (citations and internal quotation marks omitted).

The Declaratory Defendants do not take issue with the circuit court's findings of fact. In reaching its conclusion, the circuit court specifically found that the Declaratory Defendants did not show due diligence in the discovery at issue because they usually took no position regarding discovery motions. Thus, the circuit court denied the Declaratory Defendants' motion for a new trial based on our holding in *Orso*, 56 Haw. at 250, 534 P.2d at 494, in which we stated the following:

The authorities are in agreement that a new trial based on newly discovered evidence can be granted provided the evidence meet the following requirements: (1) *it must be previously undiscovered even though due diligence was exercised;* (2) it must be admissible and credible; (3) it must be of such a material and controlling nature as will probably change the outcome and not merely cumulative or tending only to impeach or contradict a witness.

(Emphasis added) (citations omitted).

The *Orso* standard applies regardless of "whether the motion based on newly discovered evidence is made pursuant to [HRCP] Rule 59 or [HRCP] Rule 60(b)(2)." *Matsumoto v. Asamura*, 5 Haw.App. 628, 631, 706 P.2d 1311, 1313 (1985). Because a movant must satisfy all three requirements of the *Orso* standard, even "[a]ssuming, arguendo, the [newly discovered] evidence is material to the issue in question," a circuit court will deny a motion for a new trial when "the [movant] has failed to demonstrate due diligence in the discovery of the evidence." *Orso*, 56 Haw. at 250, 534 P.2d at 495; *see also Deponte v. Ulupalakua Ranch, Ltd.*, 49 Haw. 672, 672–73, 427 P.2d 94, 95 (1967) (affirming a trial court's denial of a motion for a new trial under HRCP Rule 59(a) where "[t]he trial court found that the plain-

---

8. Additionally, it should be noted that the Liability Defendants did not move to increase the page limit of the supplemental brief to more than ten pages.

tiff-appellant could have obtained the evidence by diligent search prior to the conclusion of the trial"); *Clement v. Cartwright*, 7 Haw. 676, 678 (1889) (confirming the denial of a motion for a new trial where "[t]he plaintiff's showing of diligence [in procuring evidence wa]s not satisfactory"); *Matsumoto*, 5 Haw.App. at 631, 706 P.2d at 1313 (affirming a trial court's denial of a motion for a new trial pursuant to HRCP Rule 60(b)(2) where the trial court apparently agreed with the defendants' assertion "that if [the plaintiff] had exercised due diligence she would have been able to discover the new evidence prior to trial").

In addition to the fact that the Declaratory Defendants have waived any error in the circuit court's finding that the Declaratory Defendants did not show due diligence in the discovery at issue, the record also supports this finding. For example, although the Declaratory Defendants asserted in their opening brief that they joined in six of the Plaintiffs' discovery requests, the Declaratory Defendants subsequently conceded in their reply brief that they did not participate in at least three of the six discovery requests.

> There are but few cases tried in which new evidence cannot be hunted after trial, and in order to secure to parties the termination of their legal controversies the Court must be wary about granting new trials upon insufficient excuses for not procuring the evidence when the parties had their day in Court.

*Deponte*, 49 Haw. at 673, 427 P.2d at 95 (citations and internal quotation marks omitted). Therefore, we hold that the circuit court did not abuse its discretion by denying the Declaratory Defendants' motion for a new trial pursuant to HRCP Rule 59(a).

H. *The Circuit Court's Award of Taxable Costs to the Tomono Plaintiffs and the Liability Defendants*

The Declaratory Defendants contend that the circuit court erred by awarding taxable costs to the Tomono Plaintiffs and Liability Defendants as a result of their having prevailed against the Declaratory Defendants. We disagree.

■ "The trial court is vested with discretion in allowing or disallowing costs[.]"

*Mist v. Westin Hotels, Inc.*, 69 Haw. 192, 201, 738 P.2d 85, 92 (1987) (citation and internal quotation marks omitted). *See also Bjornen v. State Farm Fire and Cas. Co.*, 81 Hawai'i 105, 107, 912 P.2d 602, 604 (App. 1996).

The Tomono Plaintiffs prevailed in their declaratory action against the Declaratory Defendants, and both the Tomono Plaintiffs and the Liability Defendants prevailed with respect to the Declaratory Defendants' counterclaim and cross-claims. Thus, the circuit court awarded costs in favor of the Tomono Plaintiffs and the Liability Defendants and against the Declaratory Defendants, as follows:

(1) with respect to the Tomono Plaintiffs, $7,654.16;

(2) with respect to DuPont, $11,072.59;

(3) with respect to Platte, United Agri Products, Loveland and Hasegawa, $949.56; and

(4) with respect to Terra International, $1,182.06.

HRCP Rule 54(d) provides that, "[e]xcept when express provision therefor is made either in a statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs[.]" Furthermore, HRS § 607–9 (1993) provides the following:

> § 607–9 **Cost charges exclusive; disbursements.** No other costs of court shall be charged in any court in addition to those prescribed in this chapter in any suit, action, or other proceeding, except as otherwise provided by law.
>
> All actual disbursements, including but not limited to, intrastate travel expenses for witnesses and counsel, expenses for deposition transcript originals and copies, and other incidental expenses, including copying costs, intrastate long distance telephone charges, and postage, sworn to by an attorney or a party, and deemed reasonable by the court, may be allowed in taxation of costs. *In determining whether and what costs should be taxed, the court may consider the equities of the situation.*

(Emphasis added.)

The Declaratory Defendants challenge the circuit court's award of costs on three

grounds: (1) that the Liability Defendants were not "prevailing parties"; (2) even if the Liability Defendants were "prevailing parties," the circuit court abused its discretion by refusing to deny costs to the Liability Defendants as a sanction for DuPont's discovery misconduct; and (3) in light of DuPont's discovery misconduct, the circuit court erred by assessing the Tomono Plaintiffs' taxable costs against the Declaratory Defendants, because all such costs should have been assessed against the Liability Defendants.

■ With respect to the Declaratory Defendants' cross-claim against the Liability Defendants, the jury concluded that the Liability Defendants were not liable to the Declaratory Defendants for soil damage. Therefore, with respect to the Declaratory Defendants' cross-claims against the Liability Defendants, the Liability Defendants were clearly the "prevailing parties." The Declaratory Defendants' assertions to the contrary simply lack merit.

■ As the Declaratory Defendants correctly assert, HRS § 607–9 provides in relevant part that, "[i]n determining whether and what costs should be taxed, the court may consider the equities of the situation." Thus, although the Liability Defendants prevailed in the Declaratory Defendants' cross-claim against them, the Declaratory Defendants contend that, considering DuPont's pattern of discovery abuse throughout this litigation, the circuit court theoretically could have denied any award of taxable costs to the Liability Defendants.

However, as already stated, the record shows that the Declaratory Defendants did not exercise due diligence in pursuing discovery against DuPont, and, thus, DuPont's discovery abuse in this matter did not impact the Declaratory Defendants to the same degree that it impacted the Plaintiffs. Considering that the Liability Defendants clearly prevailed against the Declaratory Defendants in their cross-claims, the record does *not* indicate that the circuit court, in awarding taxable costs to the Liability Defendants,

clearly exceeded the bounds of reason or disregarded principles of law or practice to the substantial detriment of the Declaratory Defendants, and, thus, the circuit court did not abuse its discretion in doing so.

The Declaratory Defendants' final contention, that the Tomono Plaintiffs should not have been awarded taxable costs in light of DuPont's discovery abuse, also lacks merit. The Tomono Plaintiffs clearly prevailed against the Declaratory Defendants both in the Tomono Plaintiff's declaratory action against the Declaratory Defendants and in the Declaratory Defendants' counterclaim against the Tomono Plaintiffs. The circuit court held three days of hearings in order to determine the taxable costs to be awarded to the prevailing parties. All parties had an ample opportunity to assert their arguments with respect to any awards for taxable costs. The record does *not* indicate that the circuit court, in awarding taxable costs to the Tomono Plaintiffs and the Liability Defendants, clearly exceeded the bounds of reason or disregarded principles of law or practice to the substantial detriment of the Declaratory Defendants.

Therefore, the circuit court did not abuse its discretion, and we affirm the circuit court's awards of taxable costs to the Tomono Plaintiffs and the Liability Defendants.

### III. *CONCLUSION*

For the aforementioned reasons, we affirm the judgment and all of the circuit court's orders.

RAMIL, Justice, concurring and dissenting.

I concur with the opinion except with respect to part II.F, in which the majority construes HRCP Rule 60(b)(3) to allow affirmative relief and recovery by the Plaintiffs and the Declaratory Defendants of additional attorneys' fees and costs. While I agree that courts have the "inherent power to curb abuses and promote a fair process, including the power to impose sanctions in the form of attorneys' fees," Majority, op. at 1098, I do not believe that HRCP Rule 60(b)(3) is the appropriate vehicle by which to do so. Moreover, despite Dupont's egregious conduct in this case, the Plaintiffs and the Declaratory Defendants simply were not entitled to relief

under HRCP Rule 60(b)(3) in the form of amended findings of fact.

"[W]here the language of the statute is plain and unambiguous, our only duty is to give effect to its plain and obvious meaning." *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (1995). Here, the plain language of HRCP Rule 60(b)(3) provides that it may only be used to set aside a prior order or judgment: "the court may relieve a party or his legal representative from a *final judgment, order, or proceeding.*" HRCP Rule 60(b)(3) (emphasis added). A court may not avail itself of HRCP Rule 60(b)(3) to grant affirmative relief.

Additionally, this court has always deemed the federal courts' interpretation of the FRCP as highly persuasive because our own HRCP were patterned after the federal rules, *see Shaw v. North American Title Co.*, 76 Hawai'i 323, 326, 876 P.2d 1291, 1294 (1994); *Ellis v. Crockett*, 51 Haw. 45, 60–61, 451 P.2d 814, 824 (1969); *Harada v. Burns*, 50 Haw. 528, 532, 445 P.2d 376, 380 (1968). Federal case law interpreting FRCP Rule 60(b), the HRCP Rule 60(b)(3) counterpart, has consistently held that the Rule "is only available to set aside a prior order or judgment; a court may not use Rule 60 to grant affirmative relief in addition to the relief contained in the prior order or judgment." 12 J. Moore, *Moore's Federal Practice* § 60.25 (3d ed.1997) (footnote omitted). For example, in *Adduono v. World Hockey Ass'n*, 824 F.2d 617, 620 (8th Cir.1987), the United States Court of Appeals for the Eighth Circuit held that

> Under [FRCP] Rule 60(b), the district court may grant relief from a final order or judgment for mistake, newly-discovered evidence, fraud, voidness, satisfaction, or other reasons. [FRCP] Rule 60(b) is available, however, only to set aside a prior order or judgment. It cannot be used to impose additional affirmative relief.

*Adduono*, 824 F.2d at 620 (citation omitted). Similarly, in my view, the Plaintiffs and the Declaratory Defendants were not entitled to an award of attorneys' fees and costs under HRCP Rule 60(b)(3).

Finally, it is highly questionable that the Plaintiffs and the Declaratory Defendants were in a position to obtain *any* relief under HRCP Rule 60(b)(3), simply because, for all

intents and purposes, they were the "prevailing" parties. Once again, as the majority opinion notes, federal courts have held that a movant seeking relief under FRCP Rule 60(b) must establish (1) by clear and convincing evidence that the verdict was obtained through some form of misconduct, and (2) that such " 'conduct ... prevented the *losing* party from fully presenting his case or defense.' " Majority at 1096 (citation omitted, emphasis added). In this case, the Plaintiffs prevailed in their claim, and Dupont's misbehavior did not adversely affect the Declaratory Defendants' cross-claim against Dupont, as stated in the circuit court's finding of fact 97. Therefore, in my view, the circuit court abused its discretion when it granted Plaintiffs' and Declaratory Defendants' motion for relief under HRCP Rule 60(b)(3).

While Dupont's discovery abuses were indeed deplorable and such actions should be dissuaded, I do not believe that HRCP Rule 60(b)(3) provides the sound legal foundation upon which to do so in this case. Accordingly, I respectfully dissent with the majority opinion in part II.F.